Salvatore **DANIEL**, formerly known as Salvatore Pucci Daniele, Appellant,

v.

**PITTSBURGH & LAKE ERIE RAILROAD COMPANY**, a Corporation.

No. 16646.

United States Court of Appeals Third Circuit.

Argued Nov. 21, 1967.

Decided Feb. 23, 1968.

Harold Gondelman, Jacobson & Gondelman, Pittsburgh, Pa., for appellant.

Chauncey Pruger, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellee.

Before HASTIE, FREEDMAN and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This case involves a suit under the Federal Employers' Liability Act (45 U.S.C. § 51 et seq.) against the appellee, Pittsburgh & Lake Erie Railroad Company ("Railroad"), to recover damages for injuries that appellant, Salvatore Daniel ("Daniel") claims were caused by the negligence and carelessness of the appellee. The jury returned a verdict of $15,000 for Daniel and the appellee promptly moved for judgment n. o. v.[1] The District Court granted the motion and directed judgment entered against appellant, Daniel. From this ruling, the present appeal is taken.

██ The rule of law applicable to this case we recently restated in Albergo v. Reading Company, 372 F.2d 83, 85 (3d Cir. 1966):

"[O]ur 'appraisal of the proofs * * * is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all' in the occurrence which resulted in the plaintiff's injury. * * The test * * * 'is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury * * *.' The

1. There was no request for a new trial. The Railroad's earlier motion at the close of the testimony for a directed verdict was denied.

evidence may be minimal but it must be sufficient 'to provide the jury with some rational basis for concluding that some negligence of the railroad' proximately contributed to the accident." See Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 507, 77 S.Ct. 443, 1 L.Ed. 2d 493 (1957); Dessi v. Pennsylvania Railroad Company, 251 F.2d 149, 150, 78 S.Ct. 1006 (3d Cir. 1958); cf. Zegan v. Central Railroad Company of State of New Jersey, 266 F.2d 101, 102–104, 77 A.L.R.2d 768 (3d Cir. 1959).[2]

■ Applying this rule of law to the record in this case, however, is very difficult. The evidence must be examined "in the light most favorable to the prevailing party, resolving all conflicts of testimony in his favor, to determine whether the evidence was sufficient to carry the case to the jury." See Zegan Case, 266 F.2d supra at 102. Also there was a pronounced language problem because all those who testified, appellant Daniel and all four of the Railroad's witnesses alike, spoke extremely poor English. In some instances they apparently could not understand the questions asked.[3] The appellant's evidence consisted entirely of his own testimony, and brief portions of depositions of two of the Railroad's employees.[4] The Railroad's evidence was similarly confined to testimony in the broken English spoken by the witnesses. Such a record is quite difficult to analyze and perhaps even more than in the usual case, every possible favorable presumption should be given to the jury's determination since they had the opportunity to understand with the aid of accompanying physical gestures and expressions.

After careful consideration, we have concluded that there is sufficient evidence on this record for the jury rationally to have found that an accident occurred to Daniel on August 2, 1962 while he was working on a road crew of the Railroad. Daniel was one of seven men, including the foreman, on the crew which was operating a rail-anchor machine weighing approximately 475 pounds.[5] This machine apparently rolled along the rails and after clamping new rails securely in the proper place, fastened them to the ties with rail anchors. On the day the accident happened, it had become necessary to move this machine from track 23 to the parallel track 24. Daniel, his back toward the machine on track 23 and facing track 24, picked up the "heavy side" of the machine. At the same time, behind him and to either side, the other six men also lifted the machine. In terms of an analogy used by the trial judge during the trial, the arrangement was much like pallbearers, except Daniel was in front, walking forward, and the three men on each side faced the machine and moved sideways.

Daniel testified that while lifting the machine out of track 23 and moving toward track 24—at least a "six foot" distance existing between the two tracks—, Vittorio Di Santo let his corner (forward, right, behind Daniel) down, caus-

2. This court pointed out in the Zegan Case, supra, 266 F.2d at 104:
   "The Supreme Court has gone very far in restricting the exercise of judicial power to enter judgment contrary to verdicts in favor of injured workmen in F.E.L.A. cases where evidence of negligence or causation has been minimal."

3. Appellant's counsel and the court exchanged comments about the lack of comprehension of certain questions by one witness. At one point the judge asked the jury if they understood a witness' answer, and apparently they did. The appellant, who had only a second grade education in Italy, not only had difficulty expressing himself, but at one point was absolutely unable to understand a question concerning furlough. At 64a, counsel for the Railroad indicated that an accompanying physical gesture indicated that a witness did not understand a question concerning his deposition. In response the court said, "well, he gave those answers anyway so we will leave it there," (apparently showing the court was satisfied that the deposition was that of the witness).

4. Portions of depositions of Vittorio Di-Santo; depositions of Orlando Liberati.

5. This weight and the machine size of 62″ x 60″ was shown by the appellee's answers to certain interrogatories.

ing the machine to press more heavily against Daniel's back.[6] DiSanto, however, denied that he ever let go or lightened his share of the weight, and the other three witnesses testified that nothing happened other than moving the machine and that no one tripped or stumbled or let his end down. Even though appellant insists that "DiSanto was caused to stumble or otherwise let his end of the machine down", as to this theory of proximate cause there is no direct evidence that Daniel or anyone else ever saw this happen. Since Daniel faced away from the others,[7] he only guessed at the cause of the increased weight of the machine that he felt hurt his back. As the testimony shows by the words " * * * or something. I don't know. Maybe. * * * ", "I was work straight with the machine in my back" and "I don't know what happened to him * * * ",[8] the appellant at best gave his opinion as to the proximate cause of the accident.[9] For the jury to attribute negligence to the Railroad's agent, DiSanto, and thus to the Railroad, based on this opinion, is a conclusion as to proximate cause without a rational basis in proof.

The jury was justified, however, in finding that the injury to Daniel's back occurred during the effort of moving the machine from track 23 to track 24.[10] Daniel also testified that the area between track 23 and track 24 (the "six-foot" area) was uneven and not level because the tracks were being raised using this language:

"It no was in good condition because they was raise the tracks. Some place it was high, some place it was low. The gravel just you know a little rough, they raise the track. It was in a bad condition. * * * "

"A. I say happened right there made me to fall, careless in track.

"Q. In the track where?

"A. He is. His leg going off the place, his feet went off the place."

6. "I was in the heaviest part of the machine * * * moving 23 track to 24 because the car was coming down and the time I was across the rail, the other guy was on my right side, he jumped over the ties or something, I don't know. Maybe he jump over the ties, he cross the rail, he work at it sideway, you know, wasn't work straight, I was work straight with the machine in my back.

"The other guy, I have three guys, three on each side. This guy was on my right side. I don't know what happened to him, you know, go off the ties, the gravel, the gravel was loose, and part of the machine was coming on me. * * *

"The machine was coming in my back, you know, and I hold it, the machine. I tell the guy, 'See what you doing. Pick up the machine, it's heavy.' Then I told him, my head, you know, you pick up the machine, it was already out of rail. Then he pick up the machine, we go out. I was under the machine on account of my leg, I hold it. Then we put machine down the ground then, before we put him in the track, and another guy coming in my place, and then this guy coming, I go in the back the light place. You know, I am not used to the wheel that going on the rail and then we put the machine in the track. * * * "

See also 28a. "Q. Do you say he is the guy who let loose?

7. The relevant proof exactly on this point is DiSanto's testimony that Daniel faced ahead even while accusing him of letting go.

8. See footnote 6, supra.

9. See also: "This man, I don't know slipping off the ties, I don't know what happened, gravel or fill or something and there he going down and the machine is staying on me * * * "

10. It should be noted also, that if the jury believed Daniel's version of the facts, he alone had testified that the machine was lifted out of track 23, set down in the "six foot", and then, after he changed his position to a "side" lifter, was lifted again and placed on track 24. (See footnote 6, supra). The accident thus, in Daniel's version, is clearly confined to lifting out of track 23, and he claims he registered an oral complaint directed to DiSanto to pick up his corner before the machine was put down between the two tracks. The Railroad's witnesses contradicted this story as to the machine ever being put down during the carry, although they agree that at sometime, Daniel complained about someone not lifting his share.

"A. Yes, in the railroad track the condition not right. It's not level, got track and ties, you know, the place is six-foot between the one track and the other one and the other place we were working, raise the track, * * * "

See also testimony referred to at footnotes 6 and 9 supra, including the testimony that the gravel was "loose." The jury could have found that the terrain over which the machine had to be carried (particularly the "six-foot" area between the tracks) was not level and that the ballast was irregular so that appellant was subjected to an unreasonable risk of harm (See Restatement (Second), Torts § 282, comment g (1965)) by appellee's requiring the operation of manual transfer of the machine from track 23 to track 24 at the particular point.[11] The jury could rationally have concluded that such negligence contributed in some small part to appellant's injury. See *Zegan* Case, supra, 266 F.2d at 102–104; cf. F.A.R. Liquidating Corporation v. Brownell, 140 F.Supp. 535, 539–540 (D.Del.1956).

The appellant's lawyer suggested at the pre-trial conference that, because of the requirement that a machine of 460 pounds and of such size had to be lifted in that type of area and transported by men walking with it over uneven ballast, there was a need to balance the machine while walking in an uneven and thus unsafe place.[12] Although there was no evidence of irregularity in the "in-track" ballast, on the other hand there was evidence as to the uneven conditions in the general area. This testimony, repeated several times, was that track 23 had been recently raised up. Consequently the machine had to be carried "down" from track 23 to the "6-foot", then "up" to the next new track in the yard. A logical and reasonable inference from this evidence is that Daniel felt the sudden weight merely because a heavy machine was moved "downhill", as opposed to being moved over level ground. No one would have to slip or stumble or let go in order that Daniel, on the heavy downhill side, would feel extra weight, suddenly and far more than normal. The jury could have found that the injury was caused rather by the peculiar working conditions under which the men were ordered to perform.[13]

■ Unfortunately the present record does not contain the charge of the trial judge so that we can examine what was submitted to the jury and whether the charge could justify a finding based on liability for an "unsafe method" in an unsafe area under all the circumstances. But since we do know the pre-trial position of the appellant, it is proper on this record to assume that the charge included the theory of "unsafe method" due to dangerous or peculiar work conditions. The jury's conclusion, therefore, has a rational basis in the evidence for determining that a partial cause of the injury was the appellee's negligence.

The order of the district court granting judgment n. o. v. will be reversed and the case remanded so that the district court may reinstate the judgment for the appellant of January 18, 1967 in accordance with the foregoing opinion.

11. See 40a. The evidence that a railroad crane had never been used to move the machine except at the conclusion of a job at a certain area does not mean that its use or some other method of doing the work was not required under the circumstances of this case. cf. Texas & Pacific Ry. Co. v. Behmyer, 189 U.S. 468, 470, 23 S.Ct. 622 (1903).

12. Document 21, Proceedings of Pre-Trial Conference, 8/10/66, pp. 11–12. This theory of the case is included in the general wording of the last paragraph of p. 6 of the appellant's Brief: "the jury was justified in concluding * * * that the Railroad was negligent in compelling the plaintiff to lift and carry the machine over the dangerous area; * * *."

13. Even though, as the district court's opinion indicates it was apparently usual and customary to move the machine by manpower, the jury could find that the working conditions of this particular movement involved an unreasonable risk of harm to appellant. See footnote 11.