Fae RANDALL, Administratrix of the Estate of Harry C. Randall, Deceased, Plaintiff,

v.

READING COMPANY, Defendant.

Civ. No. 69-513.

United States District Court, M. D. Pennsylvania.

June 26, 1972.

Allen E. Ertel, Williamsport, Pa., for plaintiff.

Warren, Hill, Henkelman & McMenamin, Scranton, Pa., for defendant.

## OPINION

MUIR, District Judge.

This opinion sets forth the reasons for the Order of this Court denying defendant's motion for judgment n.o.v. or in the alternative for a new trial.

This action against the Reading Company, arising out of the death of Harry C. Randall, a railroad employee, was brought by Randall's widow, pursuant to the Federal Employers' Liability Act.[1] The jury found that negligence of the railroad in failing to furnish prompt emergency medical attention contributed to Randall's death from a heart attack and awarded plaintiff $60,000.

## I. MOTION FOR JUDGMENT N.O.V.

Defendant assigned eight grounds in support of its motion for a directed verdict, which it reiterated in its motion for judgment n.o.v.

■ First, defendant contends it is entitled to a judgment in its favor because there was "no evidence that plaintiff's decedent suffered any bodily injury as a result of an accident within the intendment of the Federal Employers' Liability Act." This contention is without merit. The uncontradicted evidence at trial revealed that the plaintiff's decedent, a rear flagman assigned to the caboose of a freight train running between Newberry, Pa. and Tamaqua, Pa., suffered a heart attack while on the job. The gravamen of the plaintiff's complaint was that the negligence of the railroad lay in its agents' decision not to attempt to ascertain Randall's whereabouts after they had reason to know, by virtue of his failure to respond to a radio call from the locomotive after a scheduled stop at Ringtown, Pa., that some mischance had befallen him. The plaintiff contended this action on the part of the railroad employees was negligence which proved fatal to Randall because, had they immediately attempted to locate him, they would have found him by the tracks in Ringtown and could by the exercise of due care under the circumstances have secured medical assistance for him which would have saved his life. The defendant's contention is, apparently, that the conduct of the railroad, which the jury found to constitute negligence contributing to Randall's death, is nevertheless not actionable under the Federal Employers' Liability Act because the precipitating cause of Randall's death was not "bodily injury" caused or contributed to by railroad negligence.

The Federal Employers' Liability Act provides, in part:

"Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier . . . ."[2]

■ According to the plain language of the statute itself, the elements of the

1. 45 U.S.C. §§ 51–59.

2. 45 U.S.C. § 51.

cause of action based on the death of a railroad employee do not include a "bodily injury." The statute imposes liability on the railroad, under certain other circumstances not here in question, for ". . . death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier . . . ." To import, as a precondition to recovery in an action predicated upon the death of a railroad employee, the requirement that death result from "bodily injury" would be to depart radically from the language of the statute itself and to erect what amounts to an "impact rule" for recovery under the Federal Employers' Liability Act. Had Congress intended such a limitation of liability, the statute could easily have been drafted to provide only for liability for injury or for death resulting from bodily injury. In eschewing a narrow reading of the word "injury" in the Act, which would have precluded recovery for silicosis, the Supreme Court in Urie v. Thompson, 337 U.S. 163, 181–182, 69 S. Ct. 1018, 1030, 93 L.Ed. 1282 (1949), stated the guiding principles in construing the Act:

> "To read into this all-inclusive wording a restriction as to the kinds of employees covered, the degree of negligence required, or the particular sorts of harms inflicted, would be contradictory to the wording, the remedial and humanitarian purpose, and the constant and established course of liberal construction of the Act followed by this Court."

Similarly, in Jamison v. Encarnacion, 281 U.S. 635, 640, 50 S.Ct. 440, 442, 74 L.Ed. 1082 (1930), the Court said: "The act is not to be narrowed by refined reasoning . . . It is to be construed liberally to fulfill the purposes for which it was enacted. . . ." In harmony with this general approach to construction of the Act, Courts have permitted recovery without requiring

proof of "bodily injury" where railroad employees suffer fatal heart attacks during their tours of duty. Williams v. Atlantic Coast Line R. Co., 190 F.2d 744, 748 (5th Cir. 1951); Miller v. Elgin Joliet & Eastern Ry. Co., 177 F.2d 224 (7th Cir. 1949); Stewart v. Baltimore & O. R. Co., 137 F.2d 527 (2d Cir. 1943); Angst v. Great Northern R. Co., 131 F. Supp. 156, 161 (D.Minn.1955) (dictum). Similarly, recovery has been permitted without proof of "bodily injury" where, through no negligence of the railroad, an employee is stricken with sudden illness on the job, rendering him helpless, and dies because of the railroad's failure to exercise due care in furnishing emergency medical assistance, after it knew or should have known of his plight. Rival v. Atchison, T. & S. F. R. Co., 62 N.M. 159, 306 P.2d 648, 64 A.L.R.2d 1098 (1957); Cortes v. Baltimore Insular Line, 287 U.S. 367, 376, 53 S.Ct. 173, 77 L.Ed. 368 (1932) (dictum); Powers v. New York Central R. Co., 251 F.2d 813 (2d Cir. 1958). See also, Anderson v. Atchison, T. & S. F. R. Co., 333 U.S. 821, 68 S.Ct. 854, 92 L.Ed. 1108 (1948); Mroz v. Dravo Corporation, 429 F.2d 1156, 1162 (3d Cir. 1970) (Jones Act; duty of care toward ill crew member); Annotation, "Master's duty to care for or to furnish medical aid to servant stricken by illness or injury." 64 A.L. R.2d 1108.

For the same reasons, defendant's fourth point, that there was no evidence that Randall suffered any accidental injury nor that his death resulted from other than natural causes,[3] is also without merit.

I have examined defendant's third point and deem it to be without merit.

In brief, the substance of defendant's points (2), (5), (6), (7) and (8) is that there was insufficient evidence adduced at trial of negligence on the part of the railroad to make a case for the jury and that, assuming negligence on the part of

3. With respect to defendant's claim that there was no evidence of a causal relationship between the alleged railroad negligence and Randall's death, see *infra*, p. 884.

the railroad, the plaintiff's proofs failed for lack of sufficient evidence on the question of the causal relation between the railroad's negligence and Randall's death.

■■ The test of the quantity and quality of evidence necessary in an F.E. L.A. case to create an issue for the jury on the questions of negligence and causation, as stated in Rogers v. Missouri P.R. Co., 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957), is

". . . simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence."

Commenting on this test in Albergo v. Reading Company, 372 F.2d 83, 85 (3d Cir. 1966), cert. denied 386 U.S. 983, 87 S.Ct. 1284, 18 L.Ed.2d 232 (1967), the Court of Appeals for this circuit said: "The evidence may be minimal but it must be sufficient 'to provide the jury with some rational basis for concluding that some negligence of the railroad' proximately contributed to the accident." See, Daniel v. Pittsburgh & Lake Erie Railroad Company, 389 F.2d 922, 923–924 (3d Cir. 1968). In Pehowic v. Erie Lackawanna Railroad Co., 430 F.2d 697 (3d Cir. 1970), the court stated, at 699–700: ". . . a trial court is justified in withdrawing such issues from the jury's consideration *only in those extremely rare instances where there is a zero probability* either of employer negligence or that any such negligence contributed to the injury of an employee." (emphasis supplied). It is well-settled that on a motion for judgment n.o.v., "the evidence must be examined in the

light most favorable to the prevailing party, resolving all conflicts of testimony in his favor, to determine whether the evidence was sufficient to carry the case to the jury." Daniel v. Pittsburgh & Lake Erie R. Co., supra, 389 F.2d at 924; Zegan v. Central R. Co. of State of New Jersey, 266 F.2d 101, 102 (3d Cir. 1959). It is impossible to say that the evidence in this case, so regarded, was insufficient under the test enunciated in *Pehowic,* and for that reason it was not error to submit to the jury the issues of negligence and causation.

■ Under the rule of Rival v. Atchison, T. & S. F. R. Co., 62 N.M. 159, 306 P.2d 648, 64 A.L.R. 1098 (1957), the plaintiff had the burden of proving (1) that Randall was stricken with illness in the course of his employment, (2) that absent prompt medical treatment, Randall's condition was such that he was threatened with loss of life or serious bodily harm, (3) that the railroad actually had, or, by the exercise of due care, would have had, notice thereof, (4) that the railroad failed to furnish prompt medical attention, and (5) that Randall's death resulted "in whole or in part" from the railroad's failure to do so.

■ A brief summary of the plaintiff's case shows that under the applicable standards the evidence, while by no means overwhelming, was sufficient to justify the submission of each of these issues to the jury.

On October 13, 1969, at 3:00 P.M., Randall reported to his assignment as rear train flagman at the defendant's Newberry yards, and was assigned to train NP–18 running from Newberry, Pennsylvania, outside Williamsport, to Tamaqua, Pennsylvania, a rail distance of 103.9 miles with intermediate stops at Rupert, Ringtown, and Haucks.[4]

Randall was alone in the caboose when the train left Rupert at 5:55 P.M. E.D.

---

4. The distance by rail from Newberry to Tamaqua along the route followed by the NP–18 is broken down as follows: Newberry to Rupert, 55.1 miles; Rupert to

Ringtown, 23.7 miles; Ringtown to Haucks, 18.1 miles; and Haucks to Tamaqua, 7.0 miles.

S.T. The radio communications system inside the NP–18 train on the night in question consisted of the engineer's radio in the lead engine, the brakeman's radio in the second engine, a portable radio for the use of the crew, and a portable radio in the caboose for use by the rear flagman.[5] The last operation involving Randall before leaving Rupert was a brake test. Before the train left Rupert, Randall reported the results of the brake test by radio.[6] The train next stopped in Ringtown at 6:50 P.M. to deliver two cars to an industrial siding— an operation which did not require Randall's participation. But at 7:30 P.M. when the train was ready to leave Ringtown and the engineer performed the brake test, there was no response from Randall to the engineer's call on the internal radio system. There was no question that such a call was made to Randall at Ringtown.[7] While there was testimony to the effect that internal radio communication between the locomotive and caboose was poor on the eastern leg of the trip after Ringtown, there was no doubt that radio communication at Ringtown was good.[8] There was testimony,[9] which the jury was entitled to believe, that three or four calls were made to Randall at Ringtown, with no response. Instead of inquiring into the reason for Randall's failure to respond by radio to report the results of the brake test or initiating an independent check to ascertain whether the brakes on the rear cars had released properly, the engineer waited for three minutes, the time required for the brakes to release,

gave the whistle two long blasts, and left Ringtown. At Lofty, radio communication again may be had for a short stretch of track.[10] Normally, the rear flagman makes a report at Lofty.[11] When Randall made none, his failure to communicate at Ringtown and Lofty became a topic of discussion amongst the crew.[12]

The question whether the railroad had a duty to render emergency medical aid beginning at the time of Randall's failure to answer at Ringtown turns on the question whether the railroad should have known or had reason to know that Randall had been stricken with an incapacitating illness or had been seriously injured. The railroad argues that a jury could not make such a determination merely from Randall's failure to answer. Although reasons other than serious incapacitating illness might have seemed equally probable explanations of Randall's failure to answer the engineer's call, in my opinion a jury could, with reason, have concluded from this fact, together with the other circumstances, that the railroad employees should have known Randall was in need of emergency medical assistance. It is impossible to say there was a "zero probability" of railroad negligence, and for that reason, the issue of negligence was properly a question for the jury. Pehowic v. Erie Lackawanna R. Co., supra.

When the NP–18 train arrived at its destination in Tamaqua at 8:40 P.M., Sweeney, the conductor, noticed that the back door of the caboose was open[13] and

---

5. I N.T. 20.

6. I N.T. 22.

7. I N.T. 49, IV N.T. 133, 140.

8. Defendant suggests in its brief at p. 18 that the unanswered call to Randall was made "at a point where such communication was difficult." The witness Artley's testimony was to the effect that, radio communication *after* Ringtown on the eastern leg of the NP–18's trip was sporadic and poor, but there was no suggestion whatever that Randall's failure to

respond *at* Ringtown might have been the result of a failure in transmission on the train's radio system. Baylor, the engineer, agreed that even Randall's failure to respond at Lofty, a town east of Ringtown, was unusual. (IV N.T. 142).

9. I N.T. 27.

10. I N.T. 48.

11. IV N.T. 142.

12. IV N.T. 111, 142.

13. II N.T. 39.

that Randall did not disembark with the rest of the crew.[14] Randall was not in the caboose. Sweeney collected Randall's lunch bag, jacket, portable radio and railroad lamp from the caboose[15] and telephoned Wentz, his supervisor, to report Randall's disappearance. Wentz testified that he received Sweeney's telephone call at his home near Mahonoy City at 9:45 P.M., over one hour after the NP–18 train arrived at Tamaqua. Wentz arranged to have a high-rail car get on the tracks at Lofty—between Tamaqua and Ringtown—and proceed toward Ringtown in search of Randall. Wentz headed toward Ringtown by car. A call was made to the Yankee Plastics plant in Ringtown at 10:30 P.M., and an employee of Yankee Plastics named Maurer, who lived near the railroad tracks, was dispatched to search along the tracks for Randall. Walking along the tracks in Ringtown with his flashlight, Maurer found Randall lying beside the tracks at approximately 11:00 P.M.[16] Maurer called to Randall but Randall did not answer him.[17] Maurer's wife called the ambulance and the doctor. Benjamin Hennessy, the Union Township Chief of Police, Michael Walaconis, an ambulance driver, Charles Faust, a deputy coroner without medical training, Clarence Barrow, an undertaker, Wentz, and several other railroad employees converged on the scene. Randall was assumed to be dead and was taken to the Ashland State Hospital, where he was pronounced dead at 1:30 A.M.

Maurer's testimony concerning Randall's appearance at 11:00 P.M. was a critical link in plaintiff's proof that the railroad's negligence contributed to Randall's death. By adducing evidence, through Maurer, from which the jury, with the aid of medical opinion, could reasonably infer that Randall was alive when he was found at 11:00 P.M., the plaintiff supplied a basis for ruling out the possibility of instantaneous or near-instantaneous death and the basis for a finding that defendant's negligence in failing to attempt to ascertain Randall's whereabouts earlier had contributed to Randall's death. Maurer, who had known Randall for twenty-two years,[18] testified that Randall "had a clear look on his face, same as when he was alive"[19] and that "[h]is coloring was as usual."[20]

Assuming as true Maurer's testimony that Randall had normal coloring at 11:00 P.M., two expert medical witnesses testified[21] that normal color indicated Randall was receiving adequate profusion to the peripheral circulatory system and, in their opinions, was alive at 11:00 P.M.

Plaintiff established without contradiction that the Ashland State Hospital, 10–15 miles from the point where Randall lay, had a coronary care unit, and plaintiff elicited the opinions of the two expert medical witnesses that had he received prompt medical attention at such a coronary care unit, Randall's life could have been saved.[22]

Neither of plaintiff's expert medical witnesses had ever examined Randall nor had they participated in the autopsy. In their testimony, they relied on an autopsy report[23] prepared by Dr. Jasper

14. III N.T. 152.

15. III N.T. 153.

16. II N.T. 16.

17. II N.T. 16.

18. II N.T. 18.

19. II N.T. 17.

20. II N.T. 17.

21. III N.T. 9; Brink (document 50), pp. 97–99.

22. Brink (document 50), at p. 100; III N.T. 9–11.

23. Relevant to this litigation was the pathologist's study of the cardiovascular system:

"The heart weighs 410 grams. There is increased epicardial fat. The coronary vessels are palpably sclerotic and hard but within their normal anatomic bed. The myocardium is dark brown and beefy red. There is no evidence of recent infarction. The endocardium is smooth and glistening. The valve leaflets are pliable. The coronary ostial are patent but narrowed. On dissection, the coronary vessels show complete

Chen See, a pathologist at Ashland State Hospital.

During direct examination, in explaining the basis for his opinion that Randall would have lived had he been given prompt medical treatment, plaintiff's expert medical witness, Dr. William Brink, testified that in a sample of 110 patients who have suffered a heart attack, approximately 35 of them will die during the first four hours; of the 35 which would die, 50% of those deaths result from cardiac arrhythmias; and 90% of the cardiac arrhythmias are correctable by prompt medical attention. The doctor testified, in his opinion, based on the autopsy reports, his experience and studies done by medical researchers involving thousands of cardiac cases: (1) patients with myocardial infarction [24] at the advanced stage of occlusion revealed in the Randall autopsy report die of only three causes: (a) shock, (b) congestive failure, or (c) arrhythmia; (2) since the pathologist noted no evidence of congestive heart failure and included no findings indicating primary shock, these possibilities could safely be ruled out and, therefore, Randall must have died from a cardiac arrhythmia; (3) Randall suffered symptoms at the onset of his heart attack; (4) Randall lived at least an hour and a half after the onset of his symptoms; (5) the time of death was between 11:00 P.M., when Randall was found, with normal color, and 1:30 A.M. the following morning, when he was pronounced dead at the Ashland State Hospital.[25] On cross-examination, Dr. Brink stated that although Dr. Chen See, the pathologist, had found and noted no evidence of recent myocardial infarction, there was, in fact, a myocardial infarction. He explained this apparent paradox by stating that in over 90% of the cases of myocardial infarction where the patient has died within four to six hours after the onset of the infarction, no gross or microscopic changes can be detected; in his opinion, the absence of anatomical changes indicating infarction was not surprising nor inconsistent with his opinions that Randall had suffered a myocardial infarction and died of an arrhythmia.[26] He also testified that in his opinion the complete occlusion of a coronary artery, such as was revealed by the autopsy, may have occurred years before Randall's death and is not inconsistent with life.[27] He testified that in cases of coronary artery occlusion, patients frequently develop what is known as "collateral circulation"[28]—a circulatory system made up of small blood vessels which accomplishes the task previously performed by the artery. He stated that in his opinion Randall had developed such collateral circulation and that the absence of a finding by the pathologist of evidence of collateral circulation was not inconsistent with that opinion because collateral circulation is not capable of detection by the normal tech-

occlusion, especially of the left anterior descending branch approximately 1.5 cms. from its origin. Posterior coronary likewise shows extensive occlusive changes, 3 cms. from its origin. The aorta and the main branches show advanced arteriosclerosis with yellow plaque formations and calcifications." Plaintiff's Exhibit # 1, Ashland State Hospital Autopsy Report prepared by Dr. Jasper Chen See.

24. Dr. Brink explained that the classic definition of "myocardial infarction" was an area [of the heart muscle] that has been deprived of blood supply, (Brink [50], 103), but that in recent years the term has come to denote not only the end stage in the process leading to cellular death in the heart muscle but the entire process from the early stages of coronary occlusion to myocardial infarction. The term "myocardial infarction" has been employed by pathologists to refer to actual cellular death in the heart muscle, but Dr. Brink testified that the term is also properly used to denote "an area of muscle which is not capable of functioning as a group of cells with the specific function for which they are designed, even though the cells may nevertheless be viable." (Brink, document 50, 103–105).

25. Brink, document 50, p. 99.

26. Brink, document 50, p. 107.

27. Brink, document 50, p. 113.

28. Brink, document 50, p. 113.

niques of pathology.[29] Dr. Brink testified that, not having been present at the time of Randall's attack, he was unable to say that he knew for a certainty that Randall had suffered symptoms [30] at the onset of his attack, but that if Randall did not, it would have been the first such case he had encountered.[31]

Defendant lays great stress on the following isolated testimony during cross-examination of Dr. Brink:

Q: Doctor, would Harry Randall have died had he had medical attention?

A: My opinion would be that he wouldn't have died had he had medical attention.

Q: And as a matter of fact, you don't know whether he would or not, do you?

A: Again, one bases one's opinion on the probability of what is going to happen. The chances are great in this percentagewise that the arrhythmia could be terminated and that he could have remained alive.

Q: That is a possibility, is it?

A: It is a very high, a very good possibility.

Q: Is there a possibility that he would have died anyway?

A: Yes, there is a possibility he would have died anyway.

Q: And as a matter of fact, you don't know, do you?

A: This again is speculative.

*    *    *    *    *    *

A: I use the term "speculating" to mean where you are dealing with things that you don't know or have no percentage of probability. When you say speculate, in my own meaning I am not speculating. I am forming my opinion on known statistics.

Q: But not on Harry Randall's condition?

A: Not specifically on one case.

Q: You are not basing it on his condition at all, are you?

A: Yes, of course. I am basing it on his condition. That is where I get my statistics.

Defendant contends that Dr. Brink's partial reliance upon the statistical results of studies by other medical researchers vitiates the witness's opinion regarding causal connection between the railroad's failure to furnish prompt medical attention and Randall's death. In essence, defendant contends Dr. Brink's opinion was entitled to be given no weight whatsoever, as a matter of law, and for this reason, plaintiff failed to establish causation. I disagree.

The test for determining whether evidence presents a jury issue on the question of causation in an F.E.L.A. case is identical to the test for sufficiency of evidence on the issue of negligence, and that test is whether from the evidence it can be said that there is a "zero probability" that negligence of the railroad contributed to the death of the employee. Pehowic v. Erie Lackawanna Railroad Co., supra. The case of Sentilles v. Inter-Caribbean Corp., 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959) is instructive on the question of the standard for expert medical testimony on the issue of causation in F.E.L.A. cases. In that case, a seaman brought suit under the Jones Act to recover damages for a serious tubercular illness alleged to have been caused by an accident [32] at sea for which the shipowner was liable. The plaintiff's theory was that the accident activated or aggravated a previously tubercular condition. Three expert medical witnesses were called. One specialist gave an opinion that "acute dissemination of the tuberculosis" *might* be a consequence of the accident; another testified that the trauma and the plaintiff's pre-existing

29. Brink, document 50, pp. 115, 117.

30. Brink, document 50, p. 124.

31. Brink, document 50, p. 125.

32. When the vessel encountered a heavy sea, the plaintiff was pitched into the air and fell back to the deck. There, a wave washed him a considerable distance.

diabetic condition were the *most likely* causes of the aggravation of the tuberculosis, although he was unable to state "which of the two it is more likely was responsible in this instance"; the third, who had never examined the plaintiff, was of the opinion that the accident "probably aggravated his condition," although he was unwilling to say definitely: "We don't ever select one item and say that is the cause of any particular aggravation." The jury returned a verdict for the plaintiff. On appeal, the defendant contended that the evidence did not justify the jury's conclusion that the accident caused the serious illness that followed it. The Court of Appeals for the Fifth Circuit agreed and reversed. 256 F.2d 156. Citing Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957) and Tennant v. Peoria & Pekin Union R. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520 (1944), the Supreme Court reversed the Court of Appeals and stated:

> "The jury's power to draw the inference that the aggravation of petitioner's tubercular condition, evident so shortly after the accident, was in fact caused by that accident, was not impaired by the failure of any medical witness to testify that it was in fact the cause. Neither can it be impaired by the lack of medical unanimity as to the respective likelihood of the potential causes of the aggravation, or by the fact that other potential causes of the aggravation existed and were not conclusively negated by the proofs. The matter does not turn on the use of a particular form of words by the physicians in giving their testimony."

The expert medical testimony on causation in the instant case was not even of the equivocal nature of the medical testimony in *Sentilles*. Here, Dr. Brink stated it was his opinion that Randall's life could have been saved by prompt medical assistance. Although he phrased his opinion in terms of probabilities at one point, he emphasized that the probabilities were very high, while allowing for the possibility that Randall's condition might have been such that no medical attention could have prolonged his life.

In my opinion, the testimony of Dr. Brink created an issue for the jury on the question of causation in this case, under the applicable standards, and for that reason it was not error to refuse defendant's motion for a directed verdict.

## II. MOTION FOR NEW TRIAL

Several rules extracted from the Reading Company's rulebooks were admitted into evidence over the defendant's objection.[33] The "General Notice"[34] accompanying the Safety Rules and Instructions, explains the purpose of the Safety Rules, whom they bind and their effective date.

■■■■■ Defendant cites, as authority for the proposition that the admission of this provision was error, the cases of Anstine v. Pennsylvania R. Co., 342 Pa. 423, 20 A.2d 774 (1941) and Dollison v. Baltimore & O. R. Co., 446 Pa. 96, 284 A.2d 704 (1971). The rule to be derived from these cases, both of which relate to the duties of the railroad at grade crossings, is that in such cases "the admission into evidence of a railroad's private operating rule may be prejudicial when that rule establishes a standard of care greater than, or more inflexible than, the law requires." Dollison v. Baltimore & O. R. Co., 446 Pa. at 102, 284 A.2d at 707. The "General Notice" to the Reading Company Safety Rules was relevant for the purposes for which it was offered and, since it establishes no standard of care whatsoever, is not objectionable on the ground that it establishes a standard of care greater than the law requires. The same may be said for each of the railroad rules admitted over objection. For example, Rule N of the "General Rules," from the Operating Rules Book, provides that prompt first aid and medical care must be provided for injured employees. Read as includ-

---

33. III N.T. 68.

34. Plaintiff's Exhibit 32.

ing employees stricken by serious incapacitating illness on the job, this rule establishes a standard for railroad employees no greater than that established by Rival v. Atchison, T. & S.F.R. Co., supra. Rule 14(d) of the Operating Rules, which provides that a signal of four long whistle blasts is the proper signal to indicate that a member of the crew giving flag protection in accordance with Operating Rule #99 may return to the train, establishes no standard of care.

There was testimony that Randall's duty at Ringtown was to protect the rear of the train in accordance with Operating Rule #99 and that in order to do so he would have had to get off the train and walk along the track to a point behind the caboose. Rule 12(d) provides that four long whistle-blasts is the signal to recall to the train a crew member who has performed this function. There was testimony that before the train left Ringtown, no four-blast signal was given in accordance with Rule 12(d); rather, a two-blast signal (indicating, according to Rule 12(b), "Release brakes. Proceed.") was given. Plaintiff's purpose in offering these rules was not to take advantage of some more stringent standard of care established by an internal railroad rule, but to supply the basis for an inference that it was the sight of the train leaving Ringtown unexpectedly, without him, which precipitated Randall's heart attack. The instructions relating to the techniques of resuscitation [35] establish no standard of care. Taken in conjunction with the "General Notice" to Safety Rules and testimony concerning the railroad's periodic examination of its employees for their knowledge of the Company's rules, they were probative in showing that the employees were familiar with the techniques of artificial respiration.

In my opinion, the admission of the rules was not error. However, if the admission of the rules, or any of them,

was error, it was harmless and, measured by the standard of F.R.Civ.P. 61, the denial of a new trial on the assumption the rulings were erroneous is not "inconsistent with substantial justice."

The balance of the points raised by defendant's motion for a new trial have been considered and in my opinion are without merit.

---

35. Plaintiff's Exhibit #33 and Safety Rules ##196–201.