IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

CRYSTAL SELLS, as Personal
Representative of THE ESTATE
OF LARRY SELLS, deceased,

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

     Appellant,

CASE NO. 1D13-4775

v.

CSX TRANSPORTATION, INC.,

     Appellee.

_____/

Opinion filed May 4, 2015.

An appeal from the Circuit Court for Duval County.
Waddell A. Wallace, Judge.

John S. Mills and Andrew D. Manko, The Mills Law Firm, P.A., Tallahassee, for
Appellant.

Andrew J. Knight, II of Moseley Prichard Parrish Knight & Jones, Jacksonville,
and Richard Caldarone, Pro Hac Vice, Mayer Brown LLP, Washington, D.C., for
Appellee.

Peter D. Webster of Carlton Fields Jorden Burt, P.A., Tallahassee, Wendy F.
Lumish of Carlton Fields Jorden Burt, P.A., Miami, and Daniel Saphire, Assistant
General Counsel, Washington, D.C., for Amicus Curiae Association of American
Railroads.

ROWE, J.

Appellant, Crystal Sells, as a personal representative of her husband's estate, challenges the trial court's order granting Appellee's, CSX Transportation, Inc.'s ("CSX's"), motion to set aside the jury's verdict and denying her motion to set aside the jury's finding of comparative negligence. We affirm the trial court's entry of directed verdict for three reasons. First, Appellant failed to establish that CSX had a duty to take preventative measures to guard against an employee suffering from cardiac arrest. Second, Appellant failed to establish that CSX's failure to procure prompt medical assistance contributed in any way to the employee's death. Third, although CSX, through its employees, has a duty to render basic first aid to seriously ill or injured employees, this duty does not require CSX to compel its employees to administer medical care in the form of life-saving techniques that require training and/or certification.

## I. Facts

In August 2006, Larry Sells was working as a conductor and Dick Wells was working as an engineer for CSX. They were conducting switch operations, which required Sells to exit the train and manually operate a switch to change tracks, in a rural area of Clay County, Florida. After he exited the train, Sells suffered cardiac arrest. Wells discovered Sells about two minutes after the attack. Pursuant to company policy and in compliance with federal regulations prohibiting employees from using cell phones while operating a train, Wells contacted CSX's dispatcher

2

via the train's radio system. Because of the dispatcher's inability to communicate Sells' exact location, the EMTs' arrival was delayed by thirteen to fifteen minutes. In total, it took the EMTs approximately thirty-five minutes to reach Sells, at which point there was nothing they could do to save his life.

Appellant sued CSX under the Federal Employers Liability Act ("FELA"), alleging that CSX's negligence caused Sells' death. She alleged that CSX owed a duty to provide Sells with a reasonably safe workplace and that it breached that duty by failing to take reasonable measures to ensure that Sells received prompt, timely, and adequate medical attention; by failing to provide reasonably safe equipment, in that CSX failed to equip its trains with automated external defibrillators ("AEDs"); by failing to train Sells' co-workers in cardiopulmonary resuscitation ("CPR"); and by failing to timely call for emergency personnel after Sells collapsed.

The case proceeded to trial and the jury returned a verdict in favor of Appellant, finding that CSX was negligent and that Sells was 45% comparatively negligent. Both parties filed post-trial motions. Appellant asked the trial court to set aside the jury's comparative negligence finding. CSX asked the trial court to set aside the verdict and enter judgment in accordance with its motion for directed verdict made at trial. The trial court granted CSX's motion and set aside the verdict. The trial court concluded as a matter of law that CSX had no duty to take

3

actions in anticipation of the possibility that Sells might suffer cardiac arrest and that Appellant failed to provide any evidence from which a jury could reasonably conclude that CSX's response to Sells' cardiac arrest caused or contributed to his death.[1] This appeal follows.

## II. Motion for Directed Verdict

Appellant argues that the trial court erred in granting the motion for directed verdict for two reasons.[2] First, Appellant argues that the trial court erred in finding that CSX had no duty to take preventive actions in anticipation of one of its employees suffering cardiac arrest. Second, Appellant argues that the trial court erred in finding that there was no evidence from which a reasonable jury could conclude that CSX's response to the emergency caused or contributed to Sells' death. Both of these arguments flow from a railroad's duty to provide the employee with a reasonably safe workplace. See Lynch v. Ne. Reg'l Commuter R.R. Corp., 836 F.Supp. 2d 620 (N.D. Ill. 2011); Foreman v. Seaboard Coast Line

---

[1] Contrary to the assertion in the dissent, the trial court never concluded that CSX did not have a duty to provide prompt medical treatment to Sells. The court found that Appellant failed to prove causation on this issue.

[2] A trial court's order directing a verdict is reviewed de novo. Williams v. Washington, 120 So. 3d 1263, 1264 (Fla. 1st DCA 2013). A directed verdict will be affirmed only when no reasonable view of the evidence could sustain a verdict in favor of the non-moving party. Id.

4

R.R. Co., 279 So. 2d 825, 827 (Fla. 1973); Randall v. Reading Co., 344 F. Supp. 879 (M.D. Penn. 1972).

With respect to providing compensation for workplace injuries, the obligations of railroads differ from those of the majority of other employers in the United States. The workers' compensation laws that cover virtually all other industries provide compensation to injured employees on a no-fault basis. However, under FELA, being injured on the job does not automatically entitle an employee of a railroad to compensation; instead, compensation is awarded only if the employer's negligence caused the injury, and compensation must be reduced to the extent of the employee's own negligence. 45 U.S.C. §§ 51, 53. FELA provides, "Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agent, or employees of such carriers . . . ." 45 U.S.C. § 51. In other words, under FELA, a railroad is responsible for its employees' injuries or death caused in whole or in part by the railroad's negligence. CSX Transp., Inc. v. McBride, 131 S.Ct. 2630, 2634 (2011). To establish a claim under FELA, the plaintiff must prove duty, breach of duty, foreseeability, and causation. Fulk v. Ill. Cent. R.R., 22 F.3d 120, 124 (7th Cir. 1994); Moody v. Boston & Marine Corp., 921 F.2d 1, 3 (1st Cir. 1990). More specifically, to prove a claim that the railroad failed to provide an

5

employee with a safe workplace, "the worker must establish that he became ill at work, that without prompt medical treatment he faced death or serious bodily harm, that the employer had notice of his illness, that the employer failed to furnish prompt medical attention, and that his death or injury resulted in whole or in part from the employer's delay in response."  Pulley v. Norfolk S. Ry. Co., Inc., 821 So. 2d 1008, 1014-15 (Ala. Civ. App. 2001).

## A.  CSX's Duty to Take Preventative Measures

First, we address whether CSX had a duty to make AEDs[3] available to its employees, to train its employees to use AEDs, and/or to train its employees in CPR.  The existence of a duty is a question of law that must be decided by the trial court, not the jury.  Fulk, 22 F.3d at 125.  As recently acknowledged by our supreme court, there are four sources of duty:  "(1) statutes or regulations; (2) common law interpretations of those statutes or regulations; (3) other sources in the common law; and (4) the general facts of the case."  Limones v. Sch. Dist. of Lee County, 2015 WL 1472236, *2 (Fla. Apr. 2, 2015).  The duty in this case arises from the common law.  Under FELA, an employer has a duty to exercise reasonable care in providing a reasonably safe workplace, reasonably safe conditions in which to work, and reasonably safe tools and equipment.  Beeber v.

---

[3] Appellant characterizes these devices as "simple" and easily "administered by anybody even without training."  However, the FDA classifies them as medical devices and now requires premarket approval of these devices.  21 C.F.R. § 870.5310.

6

<u>Norfolk S. Corp.</u>, 754 F.Supp 1364, 1368 (N.D. Ind. 1990).  As part of the duty to provide a safe workplace, the employer is required to procure medical aid and assistance for an employee when, to the employer's knowledge, the employee becomes seriously ill and unable to care for himself.  <u>S. Pac. Co. v. Hendricks</u>, 339 P.2d 731, 733 (Ariz. 1959); <u>Szabo v. Penn. R.R. Co.</u>, 40 A.2d 562, 563 (N.J. 1945).  "[T]he duty arises out of strict necessity and urgent exigency.  It arises with the emergency and expires with it."  <u>Hendricks</u>, 339 P.2d at 733 (citing <u>Szabo</u>, 40 A.2d at 563); <u>Randall</u>, 344 F.Supp. at 884 (holding that whether the railroad had a duty to render emergency medical aid turned on whether the railroad knew or should have known that the employee had been seriously injured).  An employer is not required to take preventive actions in anticipation of an employee falling ill or becoming injured.  <u>Wilke v. Chicago Great W. Ry. Co.</u>, 251 N.W. 11, 13 (Minn. 1933) (holding that an employer is not required to anticipate that the physical health and ability of an employee to care for himself while performing his work duties would suddenly cease).  Thus, long-standing case law establishes that while CSX had to procure prompt emergency medical treatment for Sells once it knew that he was seriously ill, it did not have a duty to take anticipatory measures to prevent such emergency situations.  <u>Szabo</u>, 40 A.2d at 563; <u>Wilke</u>, 251 N.W. at 13.  FELA "does not make the employer the insurer of the safety of his employees while they are on duty."  <u>Ellis v. Union Pac. R.R. Co.</u>, 329 U.S. 649, 653 (1947).

7

While there are no cases specifically addressing whether, pursuant to FELA, a railroad is required to provide AEDs or to train its employees to administer CPR or AEDs, Florida courts have previously addressed this issue in the context of the duty owed by a property owner to an invitee and the duty owed by a school to its student under the common law.[4]  See L.A. Fitness Intern, LLC v. Mayer, 980 So. 2d 550, 558 (Fla. 4th DCA 2008); Limones, 2015 WL at *4.  In L.A. Fitness, the Fourth District concluded that a business owner satisfied the legal duty to aid a patron experiencing a medical emergency by summoning medical assistance within a reasonable time.  Id. at 558.  The appellant argued that the fitness center was negligent for failing to administer CPR, failing to have an AED on its premises and to use it on the deceased, and failing to properly train its employees in the handling of medical emergencies.  Id. at 552.  The Fourth District declined to extend the property owner's duty to include providing medical care or medical rescue services, such as performing CPR or administering an AED.  Id.  The court also held that there was no common law duty that required a business to have an AED on its premises.  Id. at 561.

---

[4]  FELA is founded on common-law concepts of negligence, except to the extent that it has been modified by the removal of several common-law defenses to liability and by a relaxed standard of causation.  Consol. Rail Corp. v. Gottshall, 512 U.S. 532, 543-44 (1994); McBride, 131 S.Ct. at 2636.  Consequently, common law principles of duty are entitled to great weight in our analysis of this issue. Gottshall, 512 U.S. at 544.

8

In Limones, the supreme court held that it was for the jury to decide whether the school breached its duty to supervise its students when it failed to administer an AED on a student after he collapsed during a high school soccer game. 2015 WL at *4. The supreme court based its decision on the fact that there is a special relationship between schools and their students due to the mandatory education of children and the fact that schools stand in the place of parents during the school day and school-sponsored activities. Id. at *3. This special relationship imposes a duty on teachers and other school employees to reasonably supervise students during all school-sponsored activities. Id. Florida courts have recognized several specific duties to student athletes, including the duty "to take appropriate measures after a student is injured to prevent aggravation of the injury." Id. at *4. The court concluded that it was for the jury to determine whether the school's employees breached this duty under the particular facts of this case. Id.

The supreme court distinguished their holding from the Fourth District's holding in L.A. Fitness that a health club's duty to an adult customer was limited to reasonably summoning emergency responders for a customer in cardiac distress. Id. at *5. The court recognized that the relationship between an adult customer and a health club was far different from the relationship between a student and school board officials. Id. at 5. "Despite the fact that business proprietor-customer and school district-student relationships are both recognized as relationships, these

9

relationships are markedly different. We initially note that the proprietor-customer relationship most frequently involves two adult parties, whereas the school-student relationship usually involves a minor. Furthermore, the business invitee freely enters into a commercial relationship with the proprietor." Id. The same distinction applies to this case. The relationship between an employer and an employee is more similar to the relationship between a business and a customer than it is to the relationship between a school and a student. This case does not involve a jury question because, as in L.A. Fitness, CSX's duty was limited to summoning medical assistance once it learned that its employee was injured.

The dissent attempts to distinguish the business-invitees cases by noting that all of the businesses were "readily accessible by EMTs, as they were located in populated areas." However, accessibility has never been a factor considered when examining the duty to provide a reasonably safe workplace. See De Zon v. American President Lines, Ltd., 318 U.S. 660 (1943). In De Zon, the Supreme Court held that a ship owner had no duty to "carry a physician" on the ship, even though the ship owner was required to take reasonable measures to transport an ill or injured seaman to a physician. Id. at 668. The supreme court's conclusion that a ship that was scheduled for a sixty-day voyage was not required to carry a doctor onboard would be illogical if accessibility to medical care was to be considered when examining the duty to provide a reasonably safe workplace. See also, Olsen

10

v. Am. S.S. Co., 176 F.3d 891, 895 (6th Cir. 1999); Carleno v. Marine Trans. Lines, Inc., 317 F.2d 662, 665 (4th Cir. 1963).

Because CSX's duty to provide medical assistance arose only when the emergency occurred, the trial court properly determined that CSX had no duty to take preventative measures in anticipation of an employee suffering cardiac arrest.[5] Randall, 344 F.Supp. at 884. It is axiomatic that if CSX did not have a duty to take preventative measures, then CSX did not have a duty to provide AEDs nor to train its employees in the administration of AEDs or CPR. Thus, we affirm the trial court's grant of the motion for directed verdict on this issue.

### B. CSX's Duty Once an Emergency Arises

Second, we address Appellant's argument that she presented evidence from which a reasonable jury could conclude that CSX breached its duty to provide prompt emergency medical treatment to Sells. Appellant argues that CSX breached this duty in two respects: (1) CSX failed to promptly summon medical assistance once it learned of Sells' condition; (2) CSX failed to render medical care to Sells before the EMTs arrived. We agree that CSX failed to promptly summon medical treatment; however, Appellant is unable to establish a causal link between

---

[5] We also note that imposing a duty on railroads to provide AEDs or CPR training would necessarily require railroads to provide equipment and training to deal with a wide range of medical conditions, including diabetes, severe allergies, and epilepsy. This would be contrary to the principle that FELA does not make railroads the insurer of the safety of its employees. Gottshall, 512 U.S. at 543.

11

this failure and Sells' death. And although CSX was required to provide Sells with basic first aid while awaiting the arrival of the EMTs, we hold that CSX was under no duty to render medical care during that time.

### 1. Duty to Summon Medical Assistance

Appellant argues that CSX breached its duty to promptly summon medical assistance when it was unable to convey directions to the EMTs as to Sells' location and by its delay in calling 911, which resulted in the EMTs' failure to reach Sells until thirty-five minutes after he went into cardiac arrest. The trial court concluded, and we agree, that Appellant presented no evidence to establish that CSX's delay in summoning medical assistance caused Sells' death. In order to create a jury issue on the question of causation in a FELA case, the plaintiff must present evidence that the railroad's negligence "'played any part, even the slightest, in producing the injury or death for which damages are sought.'" Randall, 344 F.Supp. at 883 (M.D. Penn. 1972) (quoting Rogers v. Mo. P.R. Co., 352 U.S. 500, 506 (1957)). While the evidence may be minimal, it must provide the jury with a rational basis for concluding that the railroad's negligence contributed to the injury or death. Id.

The uncontroverted trial testimony established that, absent any delays, the EMTs could not have arrived on scene until fifteen minutes after Sells went into cardiac arrest. As conceded by counsel at oral argument, the medical testimony

12

conclusively demonstrated that the administration of emergency medical treatment at that point in time, without more, could not have prevented Sells' death. The dissent argues that no medical expert testified that Sells "had no chance of survival" even if the EMTs' arrival had not been delayed. This argument not only ignores counsel's repeated concessions to contrary, but it also ignores the medical testimony presented below. Sells' family practitioner testified that Sells would have been brain dead after ten minutes due to the lack of professional medical intervention. Appellant's medical expert testified that brain death begins after four or five minutes, and he testified, within a reasonable degree of medical certainty, that Sells would have been brain dead fifteen minutes after he went into cardiac arrest. He testified, "if Mr. Sells did not get effective CPR and if there was no AED, the great likelihood after 15 minutes is that he would not be able to be resuscitated in a way that would get him back to any kind of reasonable existence." Finally, the defense's expert witness testified that Sells' chances of survival after ten minutes without the provision of trained medical assistance was minimal. Here, even when the evidence is viewed in a light most favorable to Appellant, the evidence established that absent medical intervention, there was no possibility, even under perfect circumstances, of emergency medical help arriving in time to save Sells; therefore, Appellant is unable to demonstrate that any alleged breach

13

was causally related to Sells' death.[6]  See Borda v. E. Coast Ent., Inc., 950 So. 2d 488, 490 (Fla. 4th DCA 2007) (quoting Little v. Publix Supermarkets, Inc., 234 So. 2d 132, 133 (Fla. 4th DCA 1970) (holding that a motion for directed verdict should be granted when "'the evidence is of such a nature that under no view which the jury might lawfully take of it, favorable to the adverse party, could a verdict for the latter be upheld.'").

This same reasoning applies to Appellant's argument that CSX should have permitted its employees to directly call 911, instead of radioing dispatch, in the event of an emergency.  Even if Wells had directly called 911 after discovering Sells, the EMTs would not have arrived in time to save Sells.[7]  Thus, even under

---

[6] This case is distinguishable from the decision in Bridgeman v. Terminal Railroad Association of St. Louis, 552 N.E.2d 1146 (Ill. App. Ct. 1990).  In Bridgeman, the employee died as a result of acute myocardial infarction.  Id. at 1148.  The autopsy revealed that the employee was alive for a minimum of thirty minutes from the onset of the attack until death, but medical help was not summoned until forty-five minutes after the employee was discovered.  Id.  Importantly, the evidence established that the closest ambulance was approximately eight blocks away from the employee's location and that a trauma center was approximately one minute away.  Id. at 1147.  Based on these facts, the Illinois Appellate Court concluded that the evidence was sufficient to sustain the jury's conclusion that the railroad was at least partially liable for the employee's death.  Here, the evidence established that it would have taken an ambulance at least fifteen minutes to reach Sells' location and that Sells would not have survived longer than ten minutes without medical intervention.  Thus, Bridgeman is factually distinguishable from this case because there was no evidence in the current case that CSX could have summoned medical help in time to save Sells' life.

[7] Appellant's argument also ignores the fact that, in addition to CSX's policy prohibiting their use, there is a federal regulation requiring railroad employees to

14

the relaxed standard of causation applicable to FELA cases, Appellant failed to establish under these facts that CSX's alleged breach of its duty to render prompt medical care caused or contributed to Sells' death. See Crowther v. Consol. Rail Corp., 763 F.Supp. 2d 262, 265 (D. Mass. 2011) (holding that a FELA plaintiff must show not only that the railroad was negligent, but also that the railroad's negligence caused or contributed to his injuries).

### 2. *Duty to Render First Aid, Not Medical Care*

Appellant argues that CSX's failure to allow Wells to speak directly with a 911 operator contributed to Sells' death because the 911 operator would have been able to instruct Wells on how to perform CPR on Sells, which would have extended Sells' life until the EMTs arrived. She contends that a reasonable jury could have found from the evidence presented that this failure was a breach of CSX's duty to provide a reasonably safe workplace. We disagree with the contention that the reasonableness of care exercised by CSX was a question of fact that precluded the entry of the directed verdict. Even if the jury made such a finding, the law does not require CSX to provide all emergency medical care that its employees might foreseeably require. See Lundy v. Adamar of New Jersey, Inc., 34 F.3d 1173, 1179 (3d Cir. 1994).

---

turn off all personal electronic devices when on a moving train, when any member of the crew is on the ground or riding rolling equipment during a switch operation, or when any railroad employee is assisting in preparation of the train for movement. 49 C.F.R. § 220.305.

Here, we are required to examine whether a railroad's duty to provide prompt medical care encompasses a duty for employers to require their employees to perform CPR under the instruction of 911 operators. Appellant does not cite, nor can we find, any cases addressing this issue in the context of FELA; thus, we look to the common law for guidance. See Norfolk S. Ry. Co. v. Sorrell, 549 U.S. 158, 165-66 (2007) ("Absent express language to the contrary, the elements of a FELA claim are determined by reference to the common law."). As discussed above, the special relationship between the railroads and its employees gives rise to a special duty to take affirmative action to aid an injured employee. The Restatement (Second) of Torts describes a common carrier's duty to aid its passengers, including employees, as follows:

> (1) A common carrier is under a duty to its passengers to take reasonable action
>
> (a) to protect them against unreasonable risk of physical harm, and
>
> (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.
>
> (2) An innkeeper is under a similar duty to his guests.
>
> (3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.
>
> (4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of

16

his normal opportunities for protection is under a similar duty to the other.

Restatement (Second) of Torts § 314A. The duty to take reasonable action is further discussed in the comments:

> The defendant is not required to take any action until he knows or has reason to know that the plaintiff is endangered, or is ill or injured. He is not required to take any action beyond that which is reasonable under the circumstances. In the case of an ill or injured person, he will seldom be required to do more than give such first aid as he reasonably can, and take reasonable steps to turn the sick man over to a physician, or to those who will look after him and see that medical assistance is obtained. He is not required to give any aid to one who is in the hands of apparently competent persons who have taken charge of him, or whose friends are present and apparently in a position to give him all necessary assistance.

Restatement (Second) of Torts § 314A, cmt. f. As applied to the current situation, this comment demonstrates that CSX's duty was to summon medical assistance when it learned of Sells' condition and to take reasonable first aid measures until medical care arrived. See Abramson v. Ritz Carlton Hotel Co. LLC, 480 F.App'x 158, 161 (3d Cir. 2012) (relying on comment f to conclude that an innkeeper must only summon medical care and take reasonable first aid measures until medical care arrives). "[T]he duty recognized in § 314A does not extend to providing all medical care that the carrier or innkeeper could reasonably foresee might be needed by a patron." Lundy, 34 F.3d at 1179.

As observed by the Fourth District, the duty to provide first aid "does not encompass the duty to perform skilled treatments, such as CPR. 'First aid requires

17

no more assistance than that which can be provided by an untrained person.'" L.A. Fitness, 980 So. 2d at 559 (quoting Pacello v. Wyndam Int'l, 2006 WL 1102737, *6 (Conn. Super. 2006)).  The Fourth District explained that, pursuant to the American Red Cross and the American Heart Association's Guidelines for First Aid, common first aid treatments include, but are not limited to, calling for help, positioning a victim, ensuring that a seizure victim has an open airway, controlling a victim's bleeding by applying pressure, applying cold packs to soft-tissue injuries, warming a victim of hypothermia, and removing a drowning victim from the water.  Id.  While acknowledging that CPR is a commonly known technique, the Fourth District concluded that non-medical employees should not be required to perform it:

> Although the procedure for CPR is relatively simple and widely known as a major technique for saving lives, it nonetheless requires training and re-certification.  Unlike first responders, for whom performing CPR is routine, non-medical employees certified in CPR remain laymen and should have discretion in deciding when to utilize the procedure.

Id.; see also Abramson, 480 F.App'x at 162 (clarifying that "a common understanding of 'first aid' does not encompass the use of an oxygen tank or AED . . . . Rather, 'first aid' involves simple procedures that can be performed with minimal equipment and training, such as bandaging and repositioning.  CPR . . . lies at the outer limit of the term."); Salte v. YMCA of Metro. Chi. Found., 814 N.E. 2d 610, 615 (2004) (concluding that the use of a defibrillator was "far beyond

18

the type of 'first aid' contemplated by" § 314A); <u>Lee v. GNLV Corp.</u>, 22 P.3d 209, 213-14 (2001) (holding that the duty to take reasonable steps to render first aid did not include performing the "Heimlich maneuver" on a restaurant patron who was choking). Accordingly, while CSX may have been obligated to provide general first aid to Sells, even that obligation would not include the duty to require its employees to perform skilled treatment, such as CPR, on an injured co-worker.[8]

Finally, it would be a radical departure from the common law to require employers to ensure that their employees are available, capable, and willing to perform CPR on an injured co-employee while under the instruction of a 911 operator. In fact, "when an employer actually undertakes to furnish aid or assistance to an ill employee, he must exercise reasonable care in rendering such aid and assistance." <u>Hendricks</u>, 339 P.2d at 733; <u>Wilke</u>, 251 N.W. at 94 (holding that if an employer attempts to care for a sick or injured employee, the employer is liable for the failure to do so without due diligence). Thus, if an employee attempts to respond to a medical emergency but does so inadequately, the employer and the employee may be subject to a claim for having negligently rendered emergency medical services. <u>See</u> <u>L.A. Fitness</u>, 980 So. 2d at 560

---

[8] Imposing a duty on employers to require its employees to render medical treatment implicates complex labor and collective bargaining issues. This is especially true as there is no law requiring railroads to train its employees in life-saving measures, and there is no mechanism in place to indemnify and hold harmless those employees that do attempt to render medical care.

("Florida law requires that an action undertaken for the benefit of another, even gratuitously, be performed in accordance with an obligation to exercise reasonable care."); Purino v. Buffalo Athletic Club, 598 N.Y.S.2d 648 (N.Y. App. Div.), aff'd, 624 N.E.2d 676 (N.Y. 1993) (personal representative of individual who suffered a fatal heart attack at an athletic club sued, alleging that the club's employees negligently rendered emergency treatment). Consequently, we hold that CSX did not have a duty to require its employees to perform CPR on another employee under the direction of a 911 operator.[9]

## III. Conclusion

For the foregoing reasons, we affirm the trial court's grant of CSX's motion for directed verdict because Appellant failed to establish that CSX had a legal duty to train its employees in the use of CPR and AEDs or to provide its employees with AEDs, and Appellant failed to establish that any alleged breach of CSX's duty to provide prompt medical attention contributed, in whole or in part, to Sells' death. Because we affirm the trial court's grant of the motion for directed verdict, we need not address Appellant's argument that the trial court erred in denying her motion to set aside the jury's finding of comparative negligence.

AFFIRMED.

---

[9] This opinion should not be read as an attempt to discourage employees who have proper training or who feel comfortable performing CPR from assisting a fellow employee in an emergency situation.

LEWIS, C.J., CONCURS; SWANSON, J., DISSENTS WITH OPINION.

SWANSON, J., dissenting.

I respectfully dissent. In my view, CSX owed Mr. Sells a duty to act with reasonable care under the circumstances, and competent substantial evidence supports the jury's verdict that CSX breached that duty of care. Therefore, I would reverse the trial court's post-verdict order granting the motion for directed verdict. Having so decided, I must also address the second point raised by appellant and not addressed by the majority, that being whether the trial court erred by allowing the jury to consider whether Mr. Sells was comparatively at fault. On that point, for the reasons expressed below, I would affirm.

## I. Facts

Before he moved to Florida, Mr. Sells lived in New York with his family. Just prior to the move, Mr. Sells learned from his general practitioner that an electrocardiogram ("EKG") indicated a possible abnormality with the functioning of his heart. The practitioner referred Mr. Sells to a local cardiologist. During the examination, Mr. Sells told the cardiologist he was having intermittent chest pains. The cardiologist had Mr. Sells undergo another EKG and it, too, indicated a possible abnormality. As Mr. Sells was in the process of moving to Florida, the cardiologist instructed him to follow up with a Florida cardiologist. Mr. Sells failed to do so.

Approximately six months after moving to Florida, Mr. Sells began working

22

for CSX as a train conductor. As part of the employment process, he completed a medical questionnaire which asked if he had ever had any heart "trouble" or chest pains. Mr. Sells checked "no" to these questions.

On August 14, 2006, Mr. Sells was at work along with Mr. Charles Wells, a CSX train engineer. They were the only employees working at the job site which, although in a remote location in Green Cove Springs, Florida, was one where employees worked "possibly daily." While Mr. Wells was inside the train, Mr. Sells was outside throwing a switch on the track. Mr. Wells waited to hear the noise indicating the switch had been thrown, but after a couple of minutes, when he heard nothing, he looked out the window and saw Mr. Sells lying face up on the ground. He did not immediately go to help Mr. Sells. Instead, pursuant to CSX instructions concerning handling an emergency, he used the fixed train radio to call the CSX dispatcher located in the CSX operations center in Jacksonville to alert him of the situation and to provide him with Mr. Sells' location. Mr. Wells had his personal cell phone with him, but due to a CSX policy requiring contact with only CSX during an emergency, he did not use it to call 911. Mr. Wells replaced the fixed radio and then went outside to Mr. Sells. He attempted to perform cardiopulmonary resuscitation ("CPR") on Mr. Sells, but, because he was not trained in the technique, he only mimicked it as he had seen it done on television. As a result, he did not correctly perform CPR. Further, there was no automated

23

external defibrillator ("AED") available.

Meanwhile, the CSX dispatcher called 911. The CSX dispatcher was confused about the train's location and had difficulty providing it to the 911 operator. He contacted other CSX employees to assist him with trying to locate Mr. Sells. Because he could not identify the location, he had two different 911 operators on the line at once. At some point, Mr. Wells retrieved his cell phone and turned it on. It immediately rang with a call from a CSX employee asking for directions to Mr. Sells' location, which Mr. Wells provided. Several CSX employees arrived via their own vehicles, but they did not attempt to treat Mr. Sells or transport him to a medical facility for treatment; they only placed a windbreaker over his face because the sun was shining in his eyes. Following a delay of approximately thirty-five minutes after Mr. Wells found Mr. Sells on the ground, the emergency medical team ("EMT") arrived. They declared Mr. Sells dead after a couple of minutes of assessing him. The autopsy report revealed that when Mr. Sells died, he had some blockage of his heart valves but did not suffer a myocardial infarction.

Appellant filed a complaint asserting that, under the Federal Employers Liability Act ("FELA"), CSX acted negligently because it had a duty of care to provide a reasonably safe workplace and it breached that duty by failing to ensure Mr. Sells received prompt, timely, and adequate medical attention. Specifically,

24

she alleged the workplace was not safe because CSX had failed to provide an AED and ensure that co-workers were trained in CPR. She further asserted that CSX had acted negligently in causing a delay in the EMT's timely reaching Mr. Sells following his collapse, thus thwarting prompt medical treatment.

The case proceeded to trial and the jury returned a verdict in appellant's favor, finding that CSX had acted negligently,[10] but further finding that Mr. Sells was forty-five percent comparatively negligent. Post-verdict, both parties filed motions. CSX asked the court to set aside the jury's verdict and enter judgment in accordance with the motion for directed verdict made at trial. Appellant sought to set aside the jury's finding of comparative negligence. The trial court granted CSX's motion. It found that *while CSX had a duty to provide a reasonably safe workplace*, it did not have a duty to anticipate that Mr. Sells might suffer cardiac arrest, because a railroad's duty to provide medical care to its employees arises with the illness or injury and expires with it. Thus, the court concluded CSX did not have a duty to take preventive actions by providing AEDs or employees trained in CPR to Mr. Sells upon his collapse. More to the point, the trial court concluded CSX did not have a duty to provide prompt medical treatment to Mr. Sells because there was no evidence presented which indicated that any delays caused by CSX in

---

[10] The jury verdict form contained one question regarding CSX's negligence. It stated: "Was there negligence on the part of the Defendant CSX that was a legal cause of the death of Larry Sells?" The jury marked, "YES."

25

directing the EMT to Mr. Sells *caused* his death. It concluded that Mr. Sells would have died even if the EMT had been promptly summoned and had timely arrived on the scene. This pronouncement by the trial court, as ratified by the majority opinion, is simply not supported by the record of the trial.

## II. Discussion

### A. *Post-Verdict Motion for Directed Verdict*

I first note that the majority fails to fully discuss and analyze the fact that this appeal concerns the lower court's grant of a post-verdict motion for directed verdict—a crucial consideration in the analysis of this appeal.

The standard of review of an order granting a motion for a directed verdict is de novo. See Williams v. Washington, 120 So. 3d 1263, 1264 (Fla. 1st DCA 2013). "In Florida, '[a]n appellate court . . . must view the evidence and all inferences of fact in the light most favorable to the nonmoving party, and can affirm a directed verdict only where no proper view of the evidence could sustain a verdict in favor of the nonmoving party.'" Sanders v. ERP Operating Ltd. P'ship, 157 So. 3d 273, 280 (Fla. 2015) (quoting Friedrich v. Fetterman & Assocs., P.A., 137 So. 3d 362, 365 (Fla. 2013)). "'The power to direct a verdict should be exercised with caution, and it should never be granted unless the evidence is of such a nature that under no view which the jury might lawfully take of it, favorable to the adverse party, could a verdict for the latter be upheld[.]'" Borda v. E. Coast

26

Entm't., Inc., 950 So. 2d 488, 490 (Fla. 4th DCA 2007) (quoting Little v. Publix Supermarkets, Inc., 234 So. 2d 132, 133 (Fla. 4th DCA 1970)).  A motion for a directed verdict made post-verdict is subject to the same analysis as a motion made during a trial.  Johnson v. Swerdzewski, D.D.S., 935 So. 2d 57, 60 (Fla. 1st DCA 2006).

Courts should treat motions for directed verdicts with "special caution, and this is especially true in negligence cases where the function of a jury to weigh and evaluate the evidence is particularly important since reasonable people can draw various conclusions from the same evidence."  Id.  Accord Blake v. Hi Lu Corp., 781 So. 2d 1122, 1124 (Fla. 3d DCA 2001).  A motion made following a jury's verdict should be treated even more cautiously because a trial court should afford a jury's verdict great deference.  See Frazier v. Honeywell Int'l, Inc., 518 F. Supp. 2d 831, 835 (E.D. Tex. 2007).  Courts should only grant such post-verdict motions when "the facts and inferences point so strongly in favor of the movant that a rational jury could not reach a contrary verdict."  Id. (quoting Pineda v. United Parcel Serv., Inc., 360 F.3d 483, 486 (5th Cir. 2004)) (internal quotation marks omitted).

In the instant case, CSX moved for a directed verdict at the close of appellant's case, which the trial court denied.  CSX then renewed its motion after the jury returned a verdict finding CSX negligent.  At this juncture, the trial court

27

granted the motion finding, in part, that CSX had no duty to anticipate Mr. Sells would suffer a heart attack, and any duty it may have had arose with the emergency itself. It further found that because the evidence presented at trial did not demonstrate that Mr. Sells had any chance of survival even if the EMT had arrived as quickly as possible, CSX had no duty to provide prompt medical care to Mr. Sells. These conclusions require an analysis of the duty owed by CSX to Mr. Sells as well as the facts presented at trial. As set forth *infra*, in my opinion the majority, as did the trial court below, incorrectly assesses the facts that were presented to the jury, and misapplies the controlling federal law and regulations, and case law. Consequently, I conclude that the trial court abused its discretion when it granted the post-verdict motion for directed verdict and would reverse on that basis.

### *B. DUTY*

In Norfolk Southern Railway Co. v. Sorrell, 549 U.S. 158 (2007), the United States Supreme Court explained that, unlike typical workers' compensation schemes, which provide relief to employees regardless of fault, plaintiffs seeking relief under FELA must show they have suffered injury as a result of the employer's negligence. Id. at 165 (citing 45 U.S.C. § 51). The Supreme Court further explained that "[a]bsent express language to the contrary, the elements of a FELA claim are determined by reference to the common law." Id. at 165-66

28

(citing <u>Urie v. Thompson</u>, 337 U.S. 163, 182 (1949)).  Under FELA, to prevail in a negligence action the plaintiff must prove that 1) the employer owed a duty of care to the employee; 2) the employer breached that duty by acting negligently; 3) it was foreseeable that the employee would be injured; and 4) the employer's negligence caused the injury.  <u>See</u> <u>Adams v. CSX Transp., Inc.</u>, 899 F.2d 536, 539 (6th Cir. 1990).

As explained in <u>Forcino v. National Railroad Passenger Corp.</u>, 671 So. 2d 888 (Fla. 5th DCA 1996), FELA is a broad remedial statute that is to be liberally construed to accomplish Congress' intent to provide a federal remedy for railroad workers who suffer personal injuries due to the negligence of rail companies.  <u>Id</u>. at 889.  Congress enacted FELA with a capacious objective because it "'was dissatisfied with the common-law duty of the master to his servant.  The [FELA] statute supplants that duty with the far more drastic duty of paying damages for injury or death at work due in whole *or in part* to the employer's negligence.'"  <u>Id</u>. at 890 (quoting <u>Rogers v. Mo. Pac. R.R. Co.</u>, 352 U.S. 500, 506-510 (1957)) (emphasis added).  In fact, if the evidence indicates that the employer's negligence "'played *any part at all in the injury or death*[,]'" then judges "'are bound to find that a case for the jury is made out whether or not the evidence allows the jury a choice of other probabilities.'"  <u>Id</u>. at 889 (quoting <u>Rogers</u>, <u>id.</u>) (emphasis supplied in <u>Rogers</u>).  A plaintiff seeking to hold an employer liable in negligence under

29

FELA carries a significantly lighter burden than that required in an ordinary negligence case. Smith v. Soo Line R.R. Co., 617 N.W.2d 437, 439 (Minn. Ct. App. 2000).

Whether a railroad has a duty under FELA is a question of law to be decided by the court, whereas the other three elements—breach of duty, foreseeability, and causation—are questions of fact for the jury. Norfolk S. Ry. Co. v. Zeagler, 748 S.E.2d 846, 851-52 (Ga. 2013) (stating that the legal question of duty should be kept separate from the factual questions of breach, foreseeability, and causation "to ensure that the court does not inappropriately decide factual issues that should be submitted to the jury," citing Wilkerson v. McCarthy, 336 U.S. 53, 55 (1949)).

Turning to the merits of the instant appeal, the threshold issue is whether CSX owed a duty to Mr. Sells under the emergency medical situation presented by the facts, and, if so, what it was required to do.

As the trial court acknowledged, FELA places upon a railroad employer the duty to provide a reasonably safe workplace. See Atchison, Topeka & Santa Fe Ry. Co. v. Buell, 480 U.S. 557, 558 (1987). A "reasonably safe workplace"

> does not mean that the railroad has the duty to eliminate all workplace dangers, but it does have the "duty of exercising reasonable care to that end." Van Gorder v. Grand Trunk W. R.R., Inc., 509 F.3d 265, 269 (6th Cir. 2007), cert. denied, -- U.S. --, 129 S. Ct. 489 [] (2008) (citing Baltimore & Ohio S.W.R. Co. v. Carroll, 280 U.S. 491, 496 [] (1930)). "A railroad breaches its duty to its employees when it fails to use ordinary care under the circumstances or fails to do what a reasonably prudent person would have done under the circumstances

30

to make the working environment safe." Id. (citing Tiller v. Atl. C.L.R. Co., 318 U.S. 54, 67 [] (1943); Aparicio v. Norfolk & W. Ry., 84 F.3d 803, 811 (6th Cir. 1990)). In other words, "a railroad breaches its duty when it knew, or by the exercise of due care should have known that *prevalent standards of conduct were inadequate to protect the plaintiff* and similarly situated employees." Id. at 269-70 (internal quotations omitted).

Jordan v. Burlington N. Santa Fe R.R. Co., 2009 WL 112561 at *6 (Tenn. Ct. App. 2009) (emphasis added).

Under Florida law, duty may be derived from four sources: 1) legislative enactments or administrative regulations; 2) judicial interpretations of those statutes or regulations; 3) other judicial precedent; and 4) a duty arising from the general facts of the case. See McCain v. Fla. Power Corp., 593 So. 2d 500, 503 n. 2 (Fla. 1992).

Looking first to legislative enactments, in addition to FELA, in 1970 Congress adopted the Federal Railroad Safety Act ("FRSA") to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. The FRSA empowers the Secretary of the Department of Transportation to act through the Federal Railroad Administration ("FRA") to prescribe regulations and issue orders "for every area of railroad safety supplementing laws and regulations in effect." 49 U.S.C. § 20103. The FRA assumes exclusive regulatory authority over railroad safety matters when it possesses special competence due to its expertise in addressing railway safety. See

31

43 Fed. Reg. 10,585 (Mar. 14, 1978). In matters not specifically regulated by the FRSA and the FRA, the Occupational Safety and Health Act ("OSHA"), also adopted by Congress in 1970, can, in certain situations, operate to fill in any safety gaps to further ensure safety in the railroad system. See S. Pac. Transp. Co. v. Usery, 539 F.2d 386, 389-91 (5th Cir. 1976) (discussing that the FRA does not have an "industry-wide exemption" that would render OSHA regulations preempted in the railroad workplace), cert. denied, 434 U.S. 874 (1977). Courts have held that where the FRA does not preempt OSHA, OSHA regulations are admissible as general evidence of a railway's negligence. See Ries v. Nat'l R.R. Passenger Corp., 960 F.2d 1156, 1165 (3rd Cir. 1992).

In turn, OSHA regulation 29 C.F.R. 1910.151(b) requires that when employees work in a location without an infirmary, clinic, or hospital "in near proximity" to the workplace, an employer "shall" have a person or persons adequately trained in "first aid" available to treat an injured employee. This regulation signals that Congress foresaw the probability that employees will suffer illness or injury, and recognized that because employees working in remote locations are more susceptible to delayed access to EMTs or medical facilities, employers must provide basic medical care on-site.

OSHA does not define "first aid." Nor has a careful search revealed any FELA case defining "first aid." It has been suggested by some courts that it is

32

appropriate to look to cases addressing the common law duty owed by businesses to invitees when analyzing duties owed by railways to their employers because "the railroad's duty 'seems not unlike the duty of the owner of premises to an invitee. The owner must use care to keep the premises reasonably safe for the protection of the invitee.'" Glenn v. Union Pac. R.R. Co., 176 P.3d 640, 643 (Wyo. 2008) (quoting Chicago B. & Q. R.R. v. Murray, 277 P. 703, 707 (Wyo. 1929)) (footnote omitted).

In undertaking an analysis of whether CSX owed a duty to present CSX-provided CPR or an AED, or prompt medical care, to Mr. Sells, it should be noted that the jury verdict form given to the jury did not break down liability into these three separate categories. Instead, as noted above, the verdict form simply asked the jury to determine if CSX's "negligence" was a legal cause of Mr. Sells' death.

*i. CPR and AEDs*

In regard to CPR and AEDs, the trial court, and the majority, rely in part upon L.A. Fitness International, LLC v. Mayer, 980 So. 2d 550 (Fla. 4th DCA 2008), to support their conclusion that CSX did not owe Mr. Sells the duty to provide an AED or CPR by a CSX-trained employee. In L.A. Fitness, the Fourth District Court of Appeal considered a case in which a plaintiff sued a health club and asserted that the business had a duty to, among other things, have an AED on-site and to administer CPR to her father, a club member, who suffered cardiac

33

arrest while exercising. The court looked to <u>Pacello v. Wyndham International, Inc.</u>, 2006 WL 1102737 (Conn. Super. Ct. 2006), in which the Connecticut Superior Court analyzed the duty owed by innkeepers to injured or ill guests, and as part of its analysis defined what constitutes "first aid." 980 So. 2d at 559. Both the <u>L.A. Fitness</u> and the <u>Pacello</u> courts concluded that, based upon sources such as the American Red Cross, first aid does not include providing CPR to its invitees because first aid constitutes more basic acts such as controlling bleeding by applying pressure, removing a drowning victim from water, irrigating a chemical burn, or calling for help. Comparatively speaking, CPR is more than "mere 'first aid'" because it requires training to perform it. <u>Id.</u> Moreover, the Fourth District declined to find that the business had a duty to provide AEDs because there was no common law or statutory duty that a business have an AED on its premises, and because other courts have uniformly found that business establishments do not have a duty to provide AEDs on their premises. <u>Id.</u> at 561. The Fourth District concluded that, to meet its duty to its invitees, a business is only required to promptly summon EMTs in order to provide medical assistance. <u>Id.</u> at 562.

In my view, however, an analysis adopting and applying case law concerning the business-customer relationship is problematic as applied to the instant case, which concerns an employer-employee relationship, and, more important, an employee sent by his employer to work in a remote location. In

34

reaching this conclusion, I look to the recent Florida Supreme Court case, <u>Limones v. School District of Lee County</u>, 40 Fla. L. Weekly S182 (Fla. Apr. 2, 2015) ("<u>Limones II</u>"), in which the supreme court reviewed the Second District Court of Appeal's decision in <u>Limones v. School District of Lee County</u>, 111 So. 3d 901 (Fla. 2d DCA 2013) ("<u>Limones I</u>"), and the assertion that it expressly and directly conflicts with <u>McCain v. Florida Power Corp.</u> 40 Fla. L. Weekly at S182. Specifically, it considered a situation in which a student participating in a school soccer game suffered cardiac arrest and ultimately experienced a severe brain injury due to lack of oxygen caused by a delay in administering treatment with an AED. In this context, the supreme court was called to consider the significance of section 1006.165, Florida Statutes, which requires all public schools that are members in the Florida High School Athletic Association to acquire an AED, train personnel in its use, and register its location with EMTs.

In <u>Limones I</u>, the Second District considered <u>L.A. Fitness</u> and ruled there was no distinction between the duty owed by the health club to its invitee, and the duty owed by the school district to the student. 111 So. 3d at 906. The supreme court rejected this ruling. It explained:

> The Fourth District in <u>L.A. Fitness</u> determined that the duty owed by a commercial health club to an adult customer only required employees of the club to reasonably summon emergency responders for a patron in cardiac distress. . . . The adult customer and the health club stand in a far different relationship than a student involved in school activities with school board officials. Although some courts in other

35

jurisdictions have determined that fitness clubs and other commercial entities do not owe a legal duty to provide AEDs to adult customers,[] the commercial context and relationship of parties in these cases is a critical distinction from the case before us.  Despite the fact the business proprietor-customer and school district-student relationships are both recognized as relationships, these relationships are markedly different. We initially note that the proprietor-customer relationship most frequently involves two adult parties, whereas the school-student relationship usually involves a minor.  Furthermore, the business invitee freely enters into a commercial relationship with the proprietor.

Limones II, 40 Fla. L. Weekly at S184 (citations and footnote omitted).

I consider the situation in the instant case, involving an employer-employee relationship, also to be markedly different from a business-customer relationship. In the latter situation, the customer willingly enters onto the business's premises and is free to leave when he or she chooses.  In the employer-employee relationship, the employer *controls* the employee; if the employee wishes to remain employed he must work when and where the employer directs him.  See Saudi Arabian Airlines Corp. v. Dunn, 438 So. 2d 116, 120 (Fla. 1st DCA 1983).  As this Court explained in Dunn:

"An employee is one who for consideration agrees to work subject to the orders and directions of another, usually for regular wages but not necessarily so, and, further, agrees to subject himself at all times during the period of service to the lawful orders and directions of the other in respect to the work to be done.  Customarily, the employer determines both the method and manner in which the work is to be done as well as the time and tenure of the service.  [citations omitted]"

Id. (quoting City of Boca Raton v. Mattef, 91 So. 2d 644, 647 (Fla. 1956)).

36

Furthermore, another important factor that distinguishes L.A. Fitness and the cases upon which the Fourth District relied in order to reach the conclusion that the health club did not have a duty to provide AEDs or CPR but only to call EMTs, is that all of the businesses in those cases were readily accessible by EMTs, as they were located in populated areas. Here, we have a situation where Mr. Sells was working in a remote location.

I believe the correct analysis to be applied regarding whether CSX owed a duty to provide CPR and an AED to Mr. Sells is set forth in Limones II. In concluding that the school district owed the student the duty to act with reasonable care under the circumstances to avoid or mitigate further aggravation of the injury, the supreme court explained:

> "Reasonable care under the circumstances" is a standard that may fluctuate with time, the student's age and activity, the extent of the injury, the available responder(s), and other facts. Advancements with technology and equipment today, such as a portable AED, to treat an injury were most probably unavailable twenty years ago, and may be obsolete twenty years from now. *We therefore leave it to the jury to determine*, under the evidence presented, whether the particular actions of [the school district's] employees satisfied or breached the duty of reasonable care owed.

Limones II, 40 Fla. L. Weekly at S184 (emphasis added). Granted, the supreme court emphasized the point that the school district was in a position of authority over the young student who was mandated by law to be in its care. Although not as authoritative and restrictive of a relationship as this, CSX and Mr. Sells were in

37

an employer-employee relationship in which CSX dictated to Mr. Sells where he would work. I would conclude that this relationship is distinctly different from the business-customer relationship as characterized by the Fourth District in <u>L.A. Fitness</u>, because of the control the employer exercises over the employee.

Consequently, in examination of the entirety of the factual situation before us, the jury could conclude that CSX failed to provide Mr. Sells with a reasonably safe workplace when it failed to provide CPR and an AED in his aid. Unlike <u>Limones II</u>, which involved an order granting a motion for summary judgment, here, the trial court instructed the jury to consider whether CSX breached its duty to provide a reasonably safe workplace by failing to provide CPR or an AED, and prompt medical care, to Mr. Sells. As already noted, the jury verdict form did not break down the issue of CSX's liability as to its failure to provide reasonable care in these three specific areas. Instead, it was a general verdict form indicating the jury found that CSX's negligence caused Mr. Sells' death. Given the facts in the record before us, and in particular the record testimony that I will discuss, *infra*, I conclude there was competent, substantial evidence from which the jury could have found CSX liable for failing to supply CPR and an AED to Mr. Sells.

The trial court, as affirmed by the majority, concluded that CSX did not have a duty to provide CPR or an AED to Mr. Sells because "long-standing" case law indicates CSX did not have the duty "to take *preventative actions* in anticipation of

an employee falling ill at work" or "to take *anticipatory measures to prevent* such emergency situations." Both the trial court and the majority appear to be asserting that employers do not have a duty to anticipate, or foresee, that employees will suffer medical emergencies requiring prompt medical treatment, and therefore they do not need to plan for such emergencies, because the duty "arises with the emergency." They conclude that employers only need to respond when the emergency arises, basically, in the best way they can as the situation unfolds. In this regard, according to the majority, employers only have a duty to promptly call EMTs—and only if there is a likelihood that calling EMTs will result in the injured or ill employee surviving. To support this conclusion, the majority relies primarily on two cases, Szabo v. Pennsylvania R. Co., 40 A.2d 562 (N.J. 1945), and Wilke v. Chicago, Great Western Railway Co., 251 N.W. 11 (Minn. 1933).

Szabo concerned a situation in which, at that time, employers did not have a duty to provide medical care to an injured employee unless a specific statute required such, or the employer and employee had a contract between them requiring the employer to provide treatment—even when the injury was caused by the negligence of the railroad. 40 A.2d at 563. Szabo rejected the assertion that these are the only situations in which an employer had a duty to provide medical care to an employee. Instead, it created what has become known as the "humane

39

instinct doctrine,"[11] and held that when an employee becomes seriously ill and is unable to care for himself, at that point the railroad has a duty to seek appropriate medical care for the employee. Thus, Szabo elevated the duty of care formerly afforded employees, which was, as noted, only applicable when there was a statute or contract in place requiring it. Instead, employers thereafter were charged with the duty to seek appropriate medical care for all employees injured or taken ill while working for a railroad, even in the absence of a contract or statute.

A comprehensive survey of cases citing Szabo indicates that *no* court has concluded the language stating that an employer has a duty to provide care once the emergency arises, means there is no duty to anticipate emergency medical situations that might arise, or to plan for them.[12] Of the less than thirty published cases that cite to Szabo, every one that actually discusses it, analyzes it in terms of the New Jersey Supreme Court's recognizing an employer's duty of care where one previously did not exist, the duty consisting of a specifically limited role where none previously existed, and the decision's role in the evolutionary process of recognizing the duty owed by employers. None of the decisions states that an

---

[11] See generally Valentin v. Charles Beseler Co., 2005 WL 3500313 (N.J. Super. Ct.2005).

[12] Indeed, for example, OSHA regulation 29 C.F.R. 1910.151(b), requiring basic first aid to be supplied to employees working in remote locations, indicates it is foreseeable that employees will suffer injuries and need care, and in anticipation of that eventuality, employers need to ensure there is a person on-site who can provide this care.

employer has the duty only to respond to a medical emergency as it may arise, with no need to consider what measures might be needed in anticipation of those emergencies.

Wilke concerned a situation in which an employee began to exhibit signs that he was not well, and, over the course of about a half hour, wound up dying of what appeared to have been heat stroke. 251 N.W. at 13. The crux of Wilke's argument was that the railroad should have known its employee was sick, and should have done something about it, such as recognizing that due to the heat, the railroad should have had a doctor at the worksite in anticipation that some of the workers could be taken ill. The Minnesota Supreme Court rejected this assertion and stated the railroad did not have a duty to anticipate that any employee would be taken ill from heatstroke such that a doctor needed to be provided on-site. But again, as with Szabo, a careful search of case law indicates that, of the three published cases that cite to Wilke, none has cited it for the proposition that an employer does not have a duty to anticipate medical emergencies and prepare to address them.

Put simply, there is *no* long-standing case law directing that an employer does not have a duty to anticipate medical emergencies or prepare for them. Indeed, this conclusion flies in the face of federal and state safety statutes, and is in conflict with countless cases in which courts have considered an employer's duty

41

to provide a reasonably safe workplace, which necessarily requires anticipation of the types of injuries that could occur, and how they can be avoided. See, e.g., Atl. Coast R.R. Co. v. Chancey, 76 So. 2d 871, 873 (Fla. 1955) ("'The [e]mployer is not held to an absolute responsibility for the reasonably safe condition of the place, tools and appliances, but only to the duty of exercising reasonable care to that end, the degree of care being commensurate *with the danger reasonably to be anticipated*.'") (emphasis added).[13]

In conclusion, in recognition of the nature of the employer-employee relationship, and in concert with Limones II, I would reverse the trial court's order finding that CSX did not owe a duty to Mr. Sells to supply CSX-provided CPR and an AED. There is competent, substantial evidence in the record from which the jury could have found CSX liable for its failure to provide an AED and CPR to Mr. Sells under the facts of this case. See Limones II, 40 Fla. L. Weekly at S184.

*ii. Prompt Medical Care*

49 U.S.C. section 20109 of the FRSA, sets forth certain employee protections. Specifically, subsection 20109(c) prohibits a railroad from delaying medical or first aid treatment, and requires that a railroad "promptly arrange" to have the injured or ill employee transported to the nearest hospital. This regulation

---

[13] I would point out that during trial industrial hygienist Michelle Copeland presented to the jury 2001 OSHA data showing that 13% of all workplace fatalities resulted from sudden cardiac arrest.

is related to an employer's duty under FELA to provide prompt medical care to its employees rendered ill or suffering an injury while working. The duty to provide prompt medical treatment is also recognized in case law. See Pulley v. Norfolk S. Ry. Co., 821 So. 2d 1008, 1014-15 (Ala. Civ. App. 2001) (reversing an order granting summary judgment where a railway caused a delay in providing prompt medical care to a worker who had a heart attack on the job, causing additional heart damage). To recover on a claim that a railway failed to provide prompt medical care, the employee or his estate must establish that the employee became ill at work; that without prompt medical treatment he faced death or serious bodily harm; that the railway had notice of the illness and failed to furnish prompt medical attention; and the employee's death or injury resulted in whole *or in part* from the railway's delay in responding. Id. (citing Randall v. Reading Co., 344 F. Supp. 879 (M.D. Pa. 1972)). Furthermore, the specific injury that occurs need not be foreseeable; it is sufficient if it is foreseeable that general harm could result from a certain negligent practice. Id. at 1013-14 (citing Gallick v. Baltimore & Ohio R.R., 372 U.S. 108 (1963)).

The facts of the instant case are similar to those in Bridgeman v. Terminal Railroad Ass'n of St. Louis, 552 N.E.2d 1146 (Ill. App. Ct. 1990). In that case Bridgeman began to feel ill while working at a train yard. Id. at 1147. He told a co-worker he did not feel well, and he laid down on a bench. The co-worker

43

attempted to rouse Bridgeman so the train could leave, but Bridgeman continued to report he did not feel well. Bridgeman went into the bathroom and after some time, the co-worker heard him call out for the foreman. The co-worker located the foreman, and the foreman returned to the bathroom and called to Bridgeman, but Bridgeman did not respond. The foreman then left to get his supervisor. About fifteen minutes passed between when Bridgeman first reported feeling ill and when the foreman and his supervisor found him in the bathroom, slumped against the wall, pale, cold, and without a pulse. Meanwhile, the supervisor called the yardmaster to contact an ambulance, but when no ambulance arrived he called the yardmaster three or four additional times. An ambulance arrived approximately forty-five minutes later. The ambulance report indicated it had not received a call for help until approximately forty-five minutes after the foreman and the supervisor found Bridgeman in the bathroom. Testimony at trial indicated that an ambulance station was located several blocks from the train yard, and an acute trauma center was located about one minute away. Bridgeman's autopsy revealed his death was caused by acute myocardial infarction, and he had severe obstructive artery disease.[14] Id. at 1147-48.

The administrator of Bridgeman's estate filed suit under FELA, asserting that the railway had a duty under FELA to provide prompt emergency medical

---

[14] The instant record indicates that Mr. Sells did not have a myocardial infarction but he did have between 60 to 90 percent obstruction in three arteries.

care. Id. at 1148. A jury rendered a verdict in the estate's favor, and the railway appealed, arguing it did not have a duty to render aid and it did not cause Bridgeman's death because he was already dead when discovered. Id.

The Illinois appellate court opined that the railway had a duty to render prompt medical care, but the railway thwarted that duty by delaying the EMT's response. Id. It further concluded the evidence was sufficient to establish under the plain language of FELA that the railway was liable, at least in part, for Bridgeman's death, even with post-mortem evidence of myocardial infarction and obstructive artery disease, due to its delay in contacting the EMT. Id. (citing Randall v. Reading Co., 344 F. Supp. at 881-82).

In the instant case, the uncontroverted evidence revealed CSX had a policy requiring employees on trains to contact the CSX dispatcher via a fixed radio when experiencing an emergency situation. The evidence further indicated that CSX had a blanket policy forbidding its employees from using their cell phones while working. This prohibition appears to stem from FRA regulations governing the use of personal cell phones and other electronic devices while a rail employee is working. These regulations are intended to reduce safety risks that can occur because of distraction, and forbid the use of these devices if they would interfere with the "performance of safety-related duties." 49 C.F.R. §§ 220.301 & 220.303. Specifically, a "railroad operating employee" may not have his personal electronic

device turned on when a train is moving, when a crew member is on the ground or riding rolling equipment during a switching operation, or when assisting with the preparation of the train for movement. 49 C.F.R. § 220.305. However, there are exceptions to this regulation, the most crucial being that a railroad employee may use a personal electronic device "as necessary to respond to an emergency situation involving the operation of the railroad or encountered while performing a duty for the railroad." 49 C.F.R. § 220.309.

The record clearly indicates that CSX had no policy or plan in place to effectuate or allow for this "emergency situation" exception. Moreover, the testimony and evidence presented at trial indicate that CSX gave little thought as to how it would meet its duty to ensure employees working in remote locations would receive prompt medical care in emergency situations. First, CSX had in place a policy requiring train employees to use a fixed radio to call a dispatcher, thus placing responsibility on the dispatcher to relay the location and nature of the emergency which, as here, was unfolding in a remote location. The deficiency of this policy was further exacerbated by CSX's flawed internal procedures and equipment used to determine train locations—which testimony indicates was time-consuming to operate—in a situation where time was of the essence. Although this remote location was occupied on a daily or near daily basis, the CSX dispatcher could not identify the location for the EMT, and even resorted to contacting other

46

CSX employees outside of the CSX dispatch office for guidance and assistance. It was not until Mr. Wells at last turned on his cell phone and fielded a call from another CSX employee that the location was successfully provided to the EMT. The record is clear: the CSX dispatcher was ineffectual in getting the EMT to Mr. Sells. As in Bridgeman, the evidence incontrovertibly indicates that CSX caused a delay in the EMT promptly responding to Mr. Sells.

To summarize, CSX owed a duty to Mr. Sells to exercise reasonable care to ensure he received prompt medical attention. See Pulley, 821 So. 2d at 1014; Van Gorder, 509 F.3d at 269; Bridgeman, 552 N.E.2d at 1148. The jury found CSX breached this duty by failing to use ordinary care to establish a safe working environment, as evidenced by the fact that it had a deficient emergency contact procedure in place—which it mandated the employees follow—that caused a delay in Mr. Sells' receiving prompt emergency medical treatment. See 49 U.S.C. § 20109(c); Pulley, supra.; Van Gorder, supra.; Bridgeman, supra. CSX should have foreseen that its first-aid policy was inadequate to ensure that the EMT could have promptly responded to Mr. Sells' remote location. Pulley, 821 So. 2d at 1013-14 ("Under the courts' broad interpretation of 'foreseeability of harm' in FELA actions, the foreseeability of the specific harm resulting from the negligence is not required. It is sufficient if the employer could foresee general harm resulting from a certain negligent practice.").

Despite the case law, the record evidence, and the jury verdict, the majority, as did the trial court, concludes that CSX did not have a duty to provide prompt medical care to Mr. Sells because the trial testimony was "uncontroverted" that even if the EMT had arrived as quickly as possible, which the majority states was fifteen minutes, Mr. Sells would have died anyway. This evidentiary assessment is not accurate.

First, one of the Clay County paramedics who responded to the 911 call testified that they arrived at Mr. Sells' side just over thirteen minutes after the call was received at the Clay County rescue station. He testified his records indicated that by the time the EMT arrived, Mr. Sells had been on the ground between thirty-five to forty-five minutes. Further, the 253 pages of the trial transcript setting forth the testimony of Mr. Sells' treating physicians and the medical experts retained to analyze his medical records and the emergency event, clearly reflect that *not one of them* stated that "the administration of emergency medical treatment, at that point in time, without more, could not have prevented Sells' death." *None of the five medical experts*—including three board-certified cardiologists—who testified at trial stated it was a foregone conclusion that Mr. Sells had no chance of survival because the EMT had arrived in just under fourteen minutes. Instead, the medical testimony demonstrates the amorphous and nebulous nature of survivability in an emergency situation involving a heart attack, and the inability of any of the experts

48

to quantify survivability other than in terms of it being a "possibility" or a "probability."

Specifically, the record indicates that Dr. Orlando Bautista, Mr. Sells' general practitioner in New York, testified as to the difficulty in ascertaining survivability, and explained that heart rhythm could be restored "after many minutes of cardiac arrest, sometimes 15 minutes, 20 minutes." He stated that oxygenation of the brain should be restored as soon as possible, and preferably within ten minutes so that a cardiac victim does not suffer brain death. He stated that while brain death is likely to occur if there is no oxygenation by ten minutes into the emergency, medical professionals would "keep trying . . . even if it's half an hour, we keep trying to resuscitate . . . depending on what's transpiring, sometimes we wait an hour." When asked if he had an opinion within a reasonable degree of medical probability as to whether Mr. Sells would have survived if the EMT had arrived within fifteen minutes as opposed to thirty, he stated, "His chances would have been better. It would be difficult to measure, but I – just common sense says it would say it would have been better." When pressed by counsel whether there was "much of a hope" of survival after ten minutes, Dr. Bautista stated that "recovery rates go[] very low after 10 minutes."

Dr. Michael Fifer, a board-certified cardiologist, testified that the "great likelihood" was that Mr. Sells died of an arrhythmia related to coronary artery

49

disease, and that, in his opinion, Mr. Sells' chance of survival would have increased if he had received prompt medical treatment. He stated that if the EMT had arrived in less than thirty-five minutes the "window of survivability [] would have been sufficient[,]" especially if CPR and/or an AED had been utilized. He concluded that, to a reasonable degree of medical probability, Mr. Sells' survival would have increased had proper CPR been performed, *or* an AED had been available, *or* prompt medical treatment had been provided. On cross-examination he reiterated several times that if Mr. Sells had received prompt medical treatment, his chances of survival would have increased. However, he agreed with CSX's counsel that if Mr. Sells had gone without respiration for more than fifteen minutes, it would be "more likely than not" that he would have been brain dead by the time the EMT arrived. On direct, he explained that persons suffering "sudden death" from cardiac arrest could actually "be dead in the absence of efforts at resuscitation" and then be restored to life. He stated that, in his opinion, Mr. Sells suffered from one of the "more survivable" forms of arrhythmia, and he reiterated that if timely medical intervention had been provided, Mr. Sells' probability of survival would have increased, even absent CSX-provided CPR or an AED. The remainder of his testimony reveals the impossibility of definitively concluding that Mr. Sells would have died even if the EMT had arrived within fifteen minutes, as well as the impossibility of stating he would have lived, even if provided with

50

CPR, and/or an AED, and/or prompt medical care. In regard to the issue of providing prompt medical care, Dr. Fifer concluded his testimony by stating that had CSX provided prompt medical treatment, separate from the use of CSX-provided CPR or an AED, within "a reasonable degree of medical probability" Mr. Sells' likelihood of survival would have increased.

The only other medical expert to opine on Mr. Sells' survivability with prompt medical care was Dr. Michael Zile, a board-certified cardiologist. He opined that, as to the different forms of arrhythmia Mr. Sells may have experienced, he had between a zero to thirty percent chance of surviving. However, he stated he could not identify a specific cause of death. Nonetheless, he opined that even if Mr. Sells had timely received CPR, treatment with an AED, and prompt medical care, he was "not likely" to have survived. On cross examination, however, he agreed that sudden death was not "necessarily permanent" and with proper medical care a person could recover from it.

My reading of the trial transcript indicates that, contrary to the majority's conclusion,[15] the medical testimony did *not* "conclusively demonstrate" that there

---

[15] The majority attempts to buttress their conclusion in this regard by relying upon counsel's apparent "concession" to the Court during oral argument. This Court, however, is not required to accept a concession when the record indicates the facts do not comport with it. See, e.g., Fichera v. State, 688 So. 2d 453, 453 (Fla. 1st DCA 1997) (rejecting state's concession that trial court abused its discretion when setting the amount of restitution, because competent evidence supported the trial court's assessment).

was "*no* possibility of [the EMT] arriving soon enough to save Mr. Sells, even if CSX summoned help as quickly as possible." (Emphasis added.) Instead, the trial testimony reflects that *no* medical professional could definitively state that Mr. Sells would have died even if the only care provided was calling the EMT, which responded as quickly as possible. The only point upon which the medical professionals agreed was that Mr. Sells' chances of survival decreased the longer he was denied medical care.

Furthermore, the trial court's finding—that "no reasonable jury could reach a verdict for the plaintiff on th[e] basis [that CSX breached its duty to provide timely medical care], because [appellant] presented no evidence that CSX's response to Mr. Sells' cardiac arrest *caused* his death"—is flawed in several respects. (Emphasis added.) First, under the facts of this case, the correct legal analysis is not whether CSX caused Mr. Sells' death, but whether it had *any part at all* in causing Mr. Sells' death. See Forcino, 671 So. 2d at 889. "'Under [FELA] the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence *played any part, even the slightest*, in producing the injury or death for which damages are sought.'" CSX Transp., Inc. v. McBride, 131 S. Ct. 2630, 2636 (2011) (emphasis added) (citing Rogers, 352 U.S. at 506).

Second, the record demonstrates that appellant presented evidence,

particularly in the form of Dr. Bautista's and Dr. Fifer's testimony, from which the jury could conclude that CSX *contributed* to Mr. Sells' death.

Third, the trial court failed to acknowledge the governing case law such as Forcino and McBride, in which the Supreme Court, citing Urie and Rogers, discussed FELA's relaxed causation standard. The McBride court explained that FELA's language regarding causation was "'as broad as could be framed'" and, due to the "breadth of the phrase, 'resulting in whole or in part from the [railroad's] negligence,'" combined with Congress' "'humanitarian'" and "'remedial goal[s],'" when compared to common law tort litigation, FELA has a more relaxed standard of causation. Id. at 2636 (citing Consol. Rail Corp. v. Gottshall, 512 U.S. 532, 542-43 (1994)).

Fourth, by making this finding, the trial court ventured into the domain of the jury regarding the matter of causation. See Limones II, 40 Fla. L. Weekly at S183-84; Zeagler, 748 S.E.2d at 851. "Once a court has concluded that a duty exists, Florida law neither requires nor allows the court to further expand its consideration into how a reasonably prudent person would or should act under the circumstances as a matter of law." Limones II, 40 Fla. L. Weekly at S183. In Limones II the supreme court concluded that the Second District "incorrectly expanded Florida law and invaded the province of the jury when it further considered whether post-injury efforts required Respondent to make available,

diagnose the need for, or use the AED on [the student]." Id. This is exactly what the trial court and the majority did and are doing in the instant case: invading the province of the jury and concluding (incorrectly, as explained, supra), that because Mr. Sells would have died even if the EMT had been promptly summoned, CSX did not have a duty to provide prompt medical care. The trial court instructed the jury to deliberate on the matter of causation, it did so, and it produced a verdict in favor of appellant. Nonetheless, the trial court's finding that CSX did not "cause" Mr. Sells' death improperly wrested this determination from the jury and overturned its verdict. See Linafelt v. Beverly Enters.-Fla., Inc., 745 So. 2d 386, 389 (Fla. 1st DCA 1999) ("Ordinarily, a trial court should not overturn a jury verdict unless 'there is *no evidence or reasonable inferences* to support the opposing position.'" (citing Stirling v. Sapp, 229 So. 2d 850, 852 (Fla. 1969)) (emphasis added). The majority now stamps its imprimatur on this legally inappropriate action.

A trial court abuses its discretion when it bases its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence. See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990); McDuffie v. State, 970 So. 2d 312, 326 (Fla. 2007) (citing Cooter & Gell); Criner v. State, 59 So. 3d 196, 197 (Fla. 1st DCA 2011). Further, as explained in Lynch v. Northeast Regional Commuter Railroad Corp., 700 F.3d 906, 916 (7th Cir. 2012), "in FELA cases, the

54

role of the court is not to search the record for conflicting circumstantial evidence and to take the case from the jury because the evidence equally supports inconsistent and uncertain inferences. Instead, it is the function of the jury, not the court, to select among conflicting inferences and conclusions." (citing Gallick, 372 U.S. at 113). I conclude, therefore, that the trial court abused its discretion by granting the post-verdict motion for directed verdict for all these reasons.[16]

The more persuasive and accepted analysis is expressed in Budd v. Erie Lackawanna Railroad Co., 225 A.2d 171 (N.J. Super. Ct. Law Div. 1966). In Budd, the court reviewed a case in which the railroad argued on appeal that the plaintiff failed to prove negligence because she did not prove her husband would have survived had the railroad rendered medical aid to treat his heart attack. The court observed:

---

[16] I also note that the trial court's and the majority's finding that Mr. Sells would not have survived even if the EMT was promptly summoned, and thus CSX did not have a duty to provide prompt medical care, is basically the act of saddling Mr. Sells with the assumption of the risk of not receiving prompt medical care because he worked in a remote location. Congress abolished the railroad's defense of assumption of the risk when it enacted FELA in 1908. See 45 U.S.C. § 54. This statutes denies the railroad the ability to raise assumption of the risk when the railroad played a role in whole *or in part* in causing an employee's injury or death. The statute also specifically forbids raising assumption of the risk when a railroad is in violation of *any* safety statute, and the violation contributed to the injury or death of the employee. Here, CSX was in violation of not only of 49 U.S.C. section 20109(c), requiring CSX to provide prompt medical care, but 29 C.F.R. section 1910.151(b), which required CSX to provide a person trained in first aid on-site, because Mr. Sells was working at a remote location without ready access to a medical facility.

Defendant would require that there be affirmative evidence on plaintiff's part that decedent would have lived if he had been given medical attention, and that he would not have died "anyway." To require such expert prescience in the context of a heart case goes beyond the standard required by Rogers []. We must recognize that there can be no such medical certainty, for there are too many imponderables, once given the heart condition. As [the plaintiff's medical expert] said, no one can say what the result would be had medical attention been given. Because no such medical certainty exists, is a railroad employee,[] who dies and whose employer has failed in a duty owed to him, to be deprived of the benefits of FELA – an act which is construed as being akin to a workmen's compensation law? . . . Not so long as proofs support the inference that the employer's negligence "played a part" in producing the death. The proofs here meet that standard.

Id. at 174 (some citations and a footnote omitted).

I would therefore reverse the trial court's post-verdict order on these grounds.

### C. Comparative Negligence

The second point raised by appellant is whether the trial court erred by allowing the jury to consider whether Mr. Sells, himself, had been comparatively negligent, and by denying appellant's motion to set aside the jury's finding to that effect. While I would reverse the trial court's order granting CSX's post-verdict motion for directed verdict, I would affirm the jury's finding of comparative fault. The FRSA states that a railroad is liable for an injury or death suffered by an employee if its negligence, in whole or in part, caused the injury or death. 49 U.S.C. § 51. If an employee was comparatively negligent, any damages are to be

reduced by the jury in proportion to the amount of negligence attributable to the employee. 49 U.S.C. § 53. The Fifth Circuit Court of Appeals' opinion in Johnson v. Cenac Towing, Inc., 544 F.3d 296, 303-04 (5th Cir. 2008), is instructive. Johnson involved a negligence claim filed pursuant to the "Jones Act," 46 U.S.C. section 30103. Jones Act negligence cases follow FELA case law because the Act states that FELA regulations and related case law apply to actions brought under the Jones Act. Id. at 301 n. 2. See also 46 U.S.C. § 30104; Sobieski v. Ispat Island, Inc., 413 F.3d 628, 631 (7th Cir. 2005) (stating that the Jones Act incorporates by specific reference FELA case law). In Johnson, the court explained that a seaman may be found to have contributed to his injury suffered at work where he concealed material information about a preexisting injury or physical condition from his employer, exposed himself to re-injury or aggravation of his condition, and then suffered re-injury or aggravation as a result. 544 F.3d at 303-04.

The instant record indicated that when Mr. Sells filled out CSX's medical questionnaire, he checked the box stating he did not have a history of any heart "trouble" or chest pain. However, the record showed that Mr. Sells told his New York cardiologist he was having chest pains. Mr. Sells did not inform CSX at any time that he had experienced chest pains, or that he underwent three EKGs—two in New York and one in Florida—which suggested a possible abnormality. Thus,

57

under FELA and <u>Johnson</u>, the trial court properly submitted to the jury the question of Mr. Sells' comparative negligence in failing to disclose his chest pains and problematic EKGs to CSX.  <u>Id.</u>  <u>See also</u> 49 U.S.C. § 53; <u>Johnson</u>, <u>supra.</u>

### III. Conclusion

For the foregoing reasons I would reverse the final judgment and remand the cause to the trial court with directions that the court reinstate the jury's verdict, including its finding that Mr. Sells was forty-five percent comparatively negligent.